**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA AND STATE OF TEXAS,** ) ) ) | |
| **Plaintiffs,** ) ) | |
| **v.** ) ) | **Civil Action No.** |
| **E. I. DU PONT DE NEMOURS AND COMPANY, and PERFORMANCE MATERIALS, NA, INC.** ) ) ) ) ) | |
| **Defendants.** ) ) | |

**COMPLAINT**

The United States of America, by the authority of the Attorney General of the United States and through the undersigned attorneys, acting at the request of the Administrator of the United States Environmental Protection Agency ("EPA"), and the State of Texas, by the authority of the Attorney General of Texas and through the undersigned attorneys, acting at the request of the Texas Commission on Environmental Quality ("TCEQ"), file this complaint and allege as follows:

**NATURE OF THE ACTION**

1.     This is a civil action brought against E.I. du Pont de Nemours and Company ("DuPont") and Performance Materials NA, Inc. ("PMNA") (collectively "Defendants") pursuant to Section 3008(a) and (g) of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6928(a) and (g); Section 309 of the Clean Water Act ("CWA"), 33 U.S.C. § 1319;

1

Section 113(b)(2) of the Clean Air Act ("CAA"), 42 U.S.C. § 7413(b)(2); Section 7.002 of the Texas Water Code, Tex. Water Code § 7.002; and regulations promulgated thereunder, for injunctive relief and the assessment of civil penalties. The violations that are the subject of this complaint occurred at Defendants' Sabine River facility located at 3055 Farm Road 1006, Orange, Orange County, Texas ("Facility").

2.      The violations that are the subject of this Complaint relate to: Defendants' failure to comply with RCRA and the Texas Solid Waste Disposal Act (Tex. Health & Safety Code ch. 361), and other regulatory requirements, with respect to the generation, treatment, storage, and disposal of hazardous waste at the Facility; Defendants' discharge of pollutants to the air of the United States and failure to comply with other regulatory requirements in violation of the CAA and the Texas Clean Air Act (Tex. Health & Safety Code ch. 382); and DuPont's violations of the Texas Pollution Discharge Elimination System permit issued pursuant to the CWA and Chapter 26 of the Texas Water Code, Tex. Water Code ch. 26.

3.      As a result of Defendants' failure to comply with federal and state regulations, excess pollutants have been and are being emitted into the environment from the Facility. These pollutants, and some of their harmful effects, include, *inter alia*: corrosive materials (pH less than 2.0 or greater than 12.5), which cause irritation, blistering, and burns to tissue upon contact; benzene, which is a known human carcinogen and volatile organic compound ("VOC"); and other VOCs found in the ethylene process. VOCs contribute to the formation of ground-level ozone, a major constituent of smog.

## JURISDICTION

4.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

2

§§ 1331, 1345 and 1355; Section 3008(a) of RCRA, 42 U.S.C. § 6928(a); Section 309(b) of the CWA, 33 U.S.C. §§ 1319(b); and Section 113(b) of the CAA, 42 U.S.C. § 7413(b). This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

5.      This Court has personal jurisdiction over Defendants because the Facility is located in Orange County, Texas, meaning it is presently within the jurisdictional boundaries of the federal district court for the Eastern District of Texas, as established by Congress under 28 U.S.C. § 124(c).

## VENUE

6.      Venue is proper in this Judicial District under 28 U.S.C. §§ 1391(b) and 1395(a); Section 3008(a)(1) of RCRA, 42 U.S.C. § 6928(a)(1); Section 309(b) of the CWA, 33 U.S.C. § 1319(b); and Section 113(b) of the CAA, 42 U.S.C. § 7413(b), because the violations alleged in the Complaint are alleged to have occurred in, and Defendants conduct business in, this Judicial District.

## NOTICE

7.      Notice was given to the State of Texas ("Texas") prior to the commencement of this action as required by Section 3008(a)(2) of RCRA, 42 U.S.C. § 6928(a)(2); Section 309(b) of the CWA, 33 U.S.C. § 1319(b); and Section 113(b) of the CAA, 42 U.S.C. § 7413(b). Texas is a co-plaintiff in this action.

## DEFENDANTS

8.      DuPont was founded in 1802 and was incorporated in Delaware in 1915. At all times relevant to this action, DuPont is and has been a corporation organized under the laws of the State of Delaware and doing business in Texas. DuPont was owner and operator of the

Facility from 1946 through January 2019.

9.      PMNA is a wholly owned subsidiary of The Dow Chemical Company and was incorporated in Delaware in 2018. PMNA is the current owner and operator of the Facility through a Special Warranty Deed transfer of the Facility from DuPont to PMNA on or about February 1, 2019.

10.     At all times relevant to this action, each Defendant has been a "person" within the meaning of Section 1004(15) of RCRA, 42 U.S.C. § 6903(15); Section 502(5) of the CWA, 33 U.S.C. § 1362(5); Section 302(e) of the CAA, 42 U.S.C. § 7602(e); Tex. Health & Safety Code §§ 361.003(23) & 382.003(10); and Tex. Water Code § 26.001(25).

## STATUTORY AND REGULATORY FRAMEWORK

### A.      RESOURCE CONSERVATION AND RECOVERY ACT

11.     RCRA, 42 U.S.C. § 6901 *et seq.*, establishes a comprehensive program to be administered by the Administrator of EPA ("Administrator"), regulating the generation, transportation, treatment, storage, and disposal of hazardous waste.

12.     Pursuant to its authority under RCRA, EPA promulgated regulations at 40 C.F.R. Parts 260 through 272 that are applicable to generators, transporters, and treatment, storage, and disposal facilities. These regulations provide detailed requirements governing the activities of persons who generate hazardous waste. These regulations generally prohibit the treatment, storage, and disposal of hazardous waste without a permit or equivalent "interim status." These regulations also prohibit land disposal of certain hazardous waste.

13.     Pursuant to Section 3006 of RCRA, 42 U.S.C. § 6926, and 40 C.F.R. Part 271, the Administrator may authorize a state to administer a RCRA hazardous waste program in lieu of

the federal program when he or she deems the state program to be substantially equivalent to the federal program. When a state obtains such authorization, federally-approved state regulations apply in lieu of the federal RCRA regulations in that state. Federally-approved state RCRA regulations are enforceable by the United States pursuant to Section 3008(a) of RCRA, 42 U.S.C. § 6928(a).

14.     The Administrator granted final authorization to Texas to administer its Hazardous Waste Management Program in lieu of the federal program on December 12, 1984, effective December 26, 1984. 49 Fed. Reg. 48300; *see also* 40 C.F.R. § 272.2201. There have been subsequent revisions to the federal program, with corresponding revisions to the authorized State program.

15.     In Texas, the authorized hazardous waste program is managed by the TCEQ, pursuant to the Texas Solid Waste Disposal Act, Tex. Health & Safety Code ch. 361, and the rules and regulations promulgated thereunder at 30 Texas Administrative Code (Tex. Admin. Code) Chapter 335. For ease of reference, the Texas regulations are cited below followed by the applicable federal hazardous waste regulation.

16.     Pursuant to 30 Tex. Admin. Code § 335.1(146)(A) [40 C.F.R. § 261.2(a)(1)], "solid waste" is defined as any discarded material, "including solid, liquid, semisolid, or contained gaseous material resulting from industrial, municipal, commercial, mining, and agricultural operations, and from community and institutional activities," subject to certain exceptions not applicable here. Pursuant to 30 Tex. Admin. Code § 335.1(146)(B) [40 C.F.R. § 261.2(a)(2)], a discarded material is any material which is abandoned, recycled, considered inherently waste-like, or a military munition. Pursuant to 30 Tex. Admin. Code § 335.1(146)(C)

[40 C.F.R. § 261.2(b)], materials are solid wastes if they are abandoned by being (1) disposed of, (2) burned or incinerated, (3) accumulated, stored, or processed (but not recycled) before or in lieu of being abandoned by being disposed of, burned, or incinerated; or (4) sham recycled.

17.     Pursuant to 30 Tex. Admin. Code § 335.1(73), a solid waste is a "hazardous waste" if it is "identified or listed as a hazardous waste by the Administrator of the United States Environmental Protection Agency in accordance with the federal Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.*" Pursuant to 40 C.F.R. § 261.3, a solid waste is a hazardous waste if it meets any of the criteria listed in 40 C.F.R. § 261.3(a)(2)(i)-(iv): generally, if it exhibits any of the characteristics of hazardous waste (ignitability, corrosivity, reactivity, or toxicity); if it is listed; or if it is a mixture of a solid waste and one or more hazardous waste(s), and has not been excluded from regulation as a hazardous waste under 40 C.F.R. § 261.4(b).

18.     Pursuant to 30 Tex. Admin. Code § 335.1(73) [40 C.F.R. § 261.22(a)(1)], a solid waste exhibits the hazardous characteristic of corrosivity if it is aqueous and has a pH less than or equal to 2 or greater than or equal to 12.5.

19.     Pursuant to 30 Tex. Admin. Code § 335.1(73) [40 C.F.R. § 264.24(b)], a solid waste exhibits the hazardous characteristic of toxicity if it has a benzene concentration equal or greater than 0.5 milligrams per liter (mg/L) or parts per million (ppm).

20.     Pursuant to 30 Tex. Admin. Code § 335.1(67) [40 C.F.R. § 260.10], a "generator" is defined as "[a]ny person, by site, who produces municipal hazardous waste or industrial solid waste; any person who possesses municipal hazardous waste or industrial solid waste to be shipped to any other person; or any person whose act first causes the solid waste to become

6

subject to regulation" under the Industrial Solid Waste and Municipal Hazardous Waste Regulations, subject to one exception not relevant here.

21.     Pursuant to 30 Tex. Admin. Code § 335.61(a) [40 C.F.R. § 262.10(a)], a generator of hazardous waste must follow the requirements prescribed in Subchapter C, Chapter 335, Part 1, Title 30, of the Texas Administrative Code, 30 Tex. Admin. Code ch. 335, subch. C [40 C.F.R. Part 262].

22.     Pursuant to Sections 3005(a) and (e) of RCRA, 42 U.S.C. § 6925(a) and (e), and 30 Tex. Admin. Code §§ 335.2(a) and 335.43(a) [40 C.F.R. § 270.1], hazardous waste shall not be stored, processed (treated), or disposed of without a permit or interim status.

23.     Pursuant to Sections 3008(a) and (g) and 3006(g) of RCRA, 42 U.S.C. §§ 6928(a) and (g) and 6926(g), the United States may enforce the federally-approved Texas hazardous waste program, as well as the federal regulations that remain effective in Texas, by filing a civil action in United States District Court seeking civil penalties, and/or injunctive relief.

24.     Pursuant to Section 3008(g) of RCRA, 42 U.S.C. § 6928(g), as amended by the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461 note, the Debt Collection Improvement Act of 1996, 31 U.S.C. § 3701 note, and the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. No. 114-74 § 701, 129 Stat. 584, 599-60, and as provided in 40 C.F.R. Part 19, Defendant is liable for a civil penalty of up to $32,500 per day for each violation occurring after March 15, 2004 through January 12, 2009, up to $37,500 per day for each violation occurring after January 12, 2009 through November 2, 2015, and up to $76,764 per day for each violation occurring after November 2, 2015, and assessed on or after December 23, 2020.

25.     Pursuant to Tex. Water Code § 7.105, upon the request of the TCEQ, "the attorney general [of Texas] shall institute a suit in the name of the state for injunctive relief…, to recover a civil penalty, or for both injunctive relief and a civil penalty." This requirement applies generally to any violation of a "commission rule or a provision of a permit issued by the commission," Tex. Water Code § 7.032; or "a violation of a statute within the commission's jurisdiction or a rule adopted or an order or permit issued under such a statute." Tex. Water Code § 7.101. With respect to violations of the Texas Solid Waste Disposal Act and the regulations promulgated thereunder, Defendant is liable for a civil penalty of "not less than $50 nor greater than $25,000 for each day of each violation as the court or jury considers proper. Each day of a continuing violation is a separate violation." Tex. Water Code § 7.102.

**B.     CLEAN WATER ACT**

26.     Section 101(a) of the CWA, 33 U.S.C. § 1251(a), provides that the objective of the CWA is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters.

27.     To accomplish this objective, section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the "discharge of a pollutant by any person" except as authorized by and in compliance with certain enumerated sections of the CWA, including Sections 301 and 402 of the CWA, 33 U.S.C. §§ 1311 and 1342.

28.     Pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, the Administrator may issue a permit, known as the National Pollutant Discharge Elimination System ("NPDES") permit, that authorizes the discharge of a pollutant, upon the condition that such discharge meets the requirements of the CWA or other conditions that the Administrator may find are necessary.

Typically, such permits include effluent limitations, monitoring and reporting requirements, as well as operating and maintenance requirements.

29.     The term "effluent limitation" is defined in Section 502(11) of the CWA, 33 U.S.C. § 1362(11), to mean "any restriction established by a State or the Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters, the waters of the contiguous zone, or the ocean, including schedules of compliance."

30.     Pursuant to 40 C.F.R. § 122.41(e), "the permittee shall at all times properly operate and maintain all facilities and systems of treatment and control (and related appurtenances) which are installed or used by the permittee to achieve compliance with the conditions of the [NPDES] permit."

31.     Pursuant to Section 402(b) of the CWA, 33 U.S.C. § 1342(b), a state may establish its own permit program and, after receiving approval of its program by EPA, may issue NPDES permits.

32.     In 1998, the State of Texas was authorized by EPA to administer the federal NPDES program pursuant to Section 402(b) of the CWA, 33 U.S.C. § 1342(b). The TCEQ's authority for the issuance of permits is established at Section 26.027 of the Texas Water Code, Tex. Water Code § 26.027; and 30 Tex. Admin. Code ch. 305.

33.     Where a state is authorized to administer an NPDES program pursuant to Section 402(b) of the CWA, 33 U.S.C. § 1342(b), the Administrator retains the authority pursuant to Section 402(i) of the CWA, 33 U.S.C. § 1342(i), to take enforcement action under Section 309 of the CWA, 33 U.S.C. § 1319.

34.    A person may request authorization to discharge under an individual NPDES permit by submitting a complete application to EPA or an authorized State in accordance with the requirements of 40 C.F.R. § 122.21(a) and (e).  Applications are due at least 180 days prior to the commencement of a new discharge. 40 C.F.R. § 122.21(c). Manufacturing dischargers are required to provide detailed information regarding the nature of the operation and its discharges, including such information as: outfall locations; a line drawing of the water flow through the facility with a water balance, showing operations contributing wastewater to the effluent and treatment units; information on each type of process, operation, or production that is contributing wastewater for each outfall and a description of the treatment the wastewater receives; intermittent flows; potential improvements or equipment upgrades; and effluent characteristics based on quantitative data. 40 C.F.R. § 122.21(g).

35.    All permittees have a duty to correct mistakes or omissions in a permit application by promptly submitting relevant facts or information. 40 C.F.R. § 122.41(8); 30 Tex. Admin. Code § 305.125(19).

36.    All samples and measurements taken for the purpose of monitoring compliance with NPDES permit requirements shall be representative of the monitored activity. If a permittee monitors any pollutant more frequently than required by permit, the results of such monitoring shall be included in the calculation and reporting of the data submitted to the permitting authority. 40 C.F.R. §§ 122.41(j)(1) and (l)(4)(ii); *see* 30 Tex. Admin. Code § 305.125(11)(A).

37.    Permittees shall report all instances of noncompliance with permit conditions within the time frames established under 40 C.F.R. §§ 122.41(l)(6)-(7); *see* 30 Tex. Admin. Code §§ 305.125(9) and 305.125(12).

38.     Section 309(b) of the CWA, 33 U.S.C. § 1319(b), authorizes commencement of a civil action for appropriate relief, including a permanent or temporary injunction, when any person is in violation of any permit condition or limitation in an NPDES permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, including state permits.

39.     Pursuant to Section 309(d) of the CWA, 33 U.S.C. § 1319(d), as amended by the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461 note, the Debt Collection Improvement Act of 1996, 31 U.S.C. § 3701 note, and the Federal civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. No. 114-74 § 701, 129 Stat, 584, 599-60, and as provided in 40 C.F.R. Part 19, any person who violates any permit condition or limitation in an NPDES permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, including state permits, shall be subject to a civil penalty of up to $32,500 per day for each such violation occurring after March 15, 2004 through January 12, 2009, up to $37,500 per day for each such violation occurring after January 12, 2009 through November 2, 2015, and up to $56,460 for each such violation occurring after November 2, 2015, and assessed on or after December 23, 2020.

1.   **Enforcement under the Texas Water Code**

40.     Section 7.101 of the Texas Water Code states that, "A person may not cause, suffer, allow, or permit a violation of a statute within the commission's jurisdiction or a rule adopted or an order or permit issued under such a statute." Tex. Water Code § 7.101.

41.     Section 7.102 of the Texas Water Code states, in pertinent part: "A person who causes, suffers, allows, or permits a violation of a statute, rule, order, or permit relating to any … matter within the commission's jurisdiction to enforce, other than violations of [chapters not

relevant here], shall be assessed for each violation a civil penalty not less than $50 nor greater than $25,000 for each day of each violation as the court or jury considers proper. Each day of a continuing violation is a separate violation." Tex. Water Code § 7.102.

42.     Section 7.032 of the Texas Water Code states, in pertinent part: "The executive director [of the TCEQ] may enforce a commission rule or a provision of a permit issued by the commission by injunction or other appropriate remedy." Tex. Water Code § 7.032.

## C.     CLEAN AIR ACT

43.     Title I of the CAA requires EPA to establish emission standards for "hazardous air pollutants" ("HAPs") in accordance with Section 112 of the CAA, 42 U.S.C. § 7412. These standards are collectively referred to as the National Emissions Standards for Hazardous Air Pollutants and are commonly referred to as "NESHAPs." The CAA establishes a technology-based control program (i.e., based on Maximum Achievable Control Technology, or "MACT") to reduce stationary source emissions of hazardous air pollutants ("HAPs"). *See* CAA Section 112(d), 42 U.S.C. § 7412(d).

44.     The level of control mandated by the CAA for NESHAPs is:

… the maximum degree of reduction in emissions of the [HAP] … that the Administrator, taking into consideration the cost of achieving such emission reduction, and any nonair quality health and environmental impacts and energy requirements, determines is achievable for new or existing sources in the category or subcategory to which such emission standard applies….

CAA § 112(d)(2), 42 U.S.C. § 7412(d)(2). The NESHAP emissions standards can include the application of measures, processes, methods, systems or techniques including process changes, control equipment, design, work practice or operational changes, or a combination of all of the above.

1. **The Benzene Waste Operations NESHAP – 40 C.F.R. Part 61, Subpart FF**

45.     Benzene is listed as a HAP under Section 112(b) of the CAA, 42 U.S.C. § 7412(b). Benzene is a naturally occurring constituent of petroleum products and petroleum wastes. It is a known carcinogen and is highly volatile. In March 1990, EPA promulgated the NESHAP for Benzene Waste Operations applicable to benzene-containing wastes ("BWON"). The benzene regulations are set forth at 40 C.F.R. Part 61, Subpart FF. The TCEQ has received authorization from EPA to administer the BWON program in the State of Texas.

46.     Pursuant to the BWON, affected facilities are required to tabulate the total annual benzene ("TAB") content in their wastewater. If the TAB is over 10 megagrams, the facility is required to elect a control option that will require the control of all waste streams, or control of select waste streams. 40 C.F.R. § 61.342(a)-(f). Facilities that elect the control option set forth at 40 C.F.R. § 61.342(c) must manage and treat all facility waste streams with a flow-weighted annual benzene concentration of 10 parts per million (ppmw) or greater in accordance with 40 C.F.R. §§ 61.343 - 61.348, except that up to 2 megagrams (approximately 2.2 tons)[1] per year (Mg/yr) of such waste streams may be chosen for exemption from such requirements. This control option is commonly referred to as the "2 Mg

_____

[1]  A megagram, or metric ton, is equal to 2204.6 pounds or approximately 1.1 U.S. tons.

Option."

### 2. **Miscellaneous Organic Chemical Manufacturing NESHAP – 40 C.F.R. Part 63, Subpart FFFF**

47.     On November 10, 2003, EPA promulgated the NESHAP for Miscellaneous Organic Chemical Manufacturing ("MON"). The regulations are set forth at 40 C.F.R. Part 63, Subpart FFFF. The MON establishes emission limits and work practice standards for new and existing miscellaneous organic chemical manufacturing process units, wastewater treatment and conveyance systems, transfer operations, and associated ancillary equipment.

48.     The MON applies to miscellaneous organic chemical process units (MCPUs) when: (a) the MCPU is located at, or part of a facility that is a major source of HAP emissions as defined in Section 112(a) of the CAA, 42 U.S.C. § 7412(a); (b) the MCPU produces material or a family of materials which includes, but is not limited to, organic chemicals classified using the 1997 version of NAICS Code 325; and (c) the MCPU is not an affected source or part of an affected source under another subpart of 40 C.F.R. Part 63. 40 C.F.R. § 63.2435. Existing sources were required to comply with the MON requirements for existing sources no later than May 10, 2008.

49.     MON standards require that process waste streams must comply with the requirements of 40 C.F.R. §§ 63.132 - 63.148 and the requirements referenced therein, except as provided in 40 C.F.R. § 63.2485. 40 C.F.R. Part 63, Subpart FFFF, Table 7.

50.     The MON required existing sources to submit a Notification of Compliance Status Report ("NOCS") to EPA by October 7, 2008, detailing all operating scenarios and how a source will comply with the MON, including the results of emissions profiles, performance tests, and calculations to demonstrate initial compliance with applicable MON standards. 40 C.F.R.

14

§ 63.2520(d)(1)-(2). Any process changes or changes in any information submitted in the NOCS must be submitted 60 days prior to the scheduled implementation date of any such change. 40 C.F.R. § 63.2520(e)(10).

51.     Whenever any person has violated, or is in violation of, any requirement or prohibition of CAA Section 112(b), the Administrator is authorized under CAA Section 113(b), 42 U.S.C. § 7413(b), as amended by the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461 note, the Debt Collection Improvement Act of 1996, 31 U.S.C. § 3701 note, and the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. No. 114-74 § 701, 129 Stat. 584, 599-60, and as provided in 40 C.F.R. Part 19, to initiate a judicial enforcement action for a permanent or temporary injunction, and/or for a civil penalty of up to $32,500 per day for each such violation occurring after March 15, 2004 through January 12, 2009, up to $37,500 per day for each violation occurring after January 12, 2009 through November 2, 2015, and up to $102,638 per day for each violation occurring after November 2, 2015, and assessed on or after December 23, 2020..

3.  **Enforcement under the Texas Clean Air Act**

52.     Section 112(*l*) of the CAA enables EPA to approve a state program for implementation and enforcement of the NESHAP program. 42 U.S.C. § 7412(*l*). As part of its CAA Title V submission, TCEQ stated that it intended to use the mechanism of incorporation by reference to adopt Section 112 of the CAA into its regulations. 60 Fed. Reg. 30,444 (June 7, 1995); 61 Fed. Reg. 32,699 (June 25, 1996). On December 6, 2001, EPA promulgated final full approval of Texas' operating permits program effective November 30, 2001. 66 Fed. Reg. 63,318. Texas has incorporated by reference 40 C.F.R. Part 63 in 30 Tex. Admin. Code ch. 113,

subch. C. Approval of a state program does not preclude the Administrator from enforcing any applicable emission standard or requirement under CAA § 112, 42 U.S.C. § 7412(l)(7).

53.     The Texas Clean Air Act is codified at Tex. Health & Safety Code ch. 382. The purpose of the act is "to safeguard the state's air resources from pollution by controlling or abating air pollution and emissions of air contaminants, consistent with the protection of public health, general welfare, and physical property, including the esthetic enjoyment of air resources by the public and the maintenance of adequate visibility." *Id*. § 382.002(a). The Texas Clean Air Act is to be "vigorously enforced." *Id*. § 382.002(b).

54.     The TCEQ is authorized to issue permits relating to the emission of air contaminants. *Id*. § 382.051.[2]  The TCEQ is also authorized to issue administrative orders, *id.* § 382.023; and to adopt administrative rules under the Texas Clean Air Act, *id.* § 382.017(a).

55.     Except as authorized by a rule or order of the TCEQ, a person may not cause, suffer, allow, or permit the emission of any air contaminant or the performance of any activity that causes or contributes to, or that will cause or contribute to, air pollution in Texas. Tex. Health & Safety Code § 382.085(a). Likewise, a person may not cause, suffer, allow, or permit the emission of any air contaminant or the performance of any activity in violation of the Texas Clean Air Act or of any rule or order of the TCEQ. *Id.* § 382.085(b).

56.     Pursuant to 30 Tex. Admin. Code § 101.20, a person owning or operating a source of air contaminants in Texas must comply with standards and conditions established by EPA in

---

[2]  Some TCEQ permits apply to "federal sources" and are styled "Federal Operating Permits." *Id.* §§ 382.051(a)(3), 382.051(b).  Despite this nomenclature, the authority to issue such permits is delegated from the Texas Legislature to the TCEQ through a state statute. *Id.*

Sections 111 and 112 of the Federal Clean Air Act and conditions of any permit issued by the EPA pursuant to 40 C.F.R § 52.21.

57.     Likewise, pursuant to 30 Tex. Admin. Code § 122.143(4), a person holding an air permit in Texas must "comply with all terms and conditions codified in the permit and any provisional terms and conditions required to be included with the permit." A person holding a permit, special permit, standard permit, or special exemption must comply with all special conditions contained in the permit document, pursuant to 30 Tex. Admin. Code § 116.115(c).

58.     Further, "any noncompliance with either the terms or conditions codified in the permit or the provisional terms and conditions, if any, constitutes a violation of the [Federal Clean Air Act] and the [Texas Clean Air Act] and is grounds for enforcement action [and other penalties]." 30 Tex. Admin. Code § 122.143(4).

59.     Whenever any person has violated the Texas Clean Air Act (Tex. Health & Safety Code ch. 382) or the regulations promulgated thereunder, that person is liable to the State for a civil penalty of "not less than $50 nor greater than $25,000 for each day of each violation as the court or jury considers proper. Each day of a continuing violation is a separate violation." Tex. Water Code § 7.102. The State may also seek injunctive relief to "restrain the violation or threat of violation," pursuant to Tex. Water Code § 7.032(b).

## GENERAL ALLEGATIONS

60.     The Facility operates various production areas, a cogeneration unit, the Sabine River Regional Incinerator, and a wastewater treatment facility. PMNA acquired the Facility from DuPont in April 2019 and continues operations there. The Facility has been operated by DuPont and PMNA to produce ethylene that is used onsite to manufacture low-density

17

polyethylene and ethylene copolymers, or is delivered via pipeline for sale to other industrial users.

61.     The Facility also produces low-density polyethylene polymers and various specialty polymers at its C, D, and G Units. The Facility's North American Industrial Classification (NAICS) Codes are 325110, 325211, and 562211.

62.     In addition, Defendants have owned and operated a wastewater treatment system that treats industrial wastewater from Defendants' processes as well as wastewaters generated by INVISTA S.ã.r.l. ("INVISTA"), a separate entity that owns other chemical manufacturing processes at the same plant site as the Facility.

63.     From on or about March 31, 2009, through April 9, 2009, EPA inspectors conducted an initial RCRA, CAA and CWA compliance investigation at the Facility ("2009 Inspection").

64.     From on or about December 7, 2015, through December 10, 2015, EPA inspectors conducted a second multimedia compliance investigation at the Facility ("2015 Inspection").

65.     On January 25, 2016, EPA made an unannounced visit to the Facility as a follow-up to the 2015 Inspection to observe the Facility's progress in addressing certain violations of the CAA.

66.     PMNA's operations at the Facility began in February 2019, so only the references to DuPont's operations and violations at the Facility that pre-date PMNA's operations there form the basis for claims against DuPont. References to operations and violations at the Facility that have continued to occur since February 2019 form the basis for claims against PMNA.

A.     **General RCRA and TSWDA Allegations**

67.     The Facility uses a ditch and canal system to transport cooling water, storm water, and process wastewater throughout the plant. The system is composed of several wood-lined ditches, several roadside storm water ditches, and two canals. Ditch and canal water can either be circulated to the cooling water reservoir system or sent to the wastewater treatment system (biological treatment ponds).

68.     The Third Street Wood-Lined Ditch is located south of Third Street and contains a dam near Avenue E, which splits the direction of flow. Wastewater east of the dam drains east through the East Conduit. A mixing cell in the East Conduit mixes and neutralizes the pH of the wastewater received from various sources and sends the mixture underground through a concrete channel to a receiving pond. The Third Street Wood-Lined Ditch and the East Conduit contain eight pH meters to monitor pH levels. DuPont also disposed of maintenance wastes collected by vacuum trucks into the Shell Pit.

69.     The Third-Street Wood-Lined Ditch, the East Conduit and the Shell Pit are each a "surface impoundment" as that term is defined by 30 Tex. Admin. Code § 335.1(154) [40 C.F.R. § 260.10].

70.     At all times relevant to this action through at least January 2019, DuPont was an owner and/or operator of the Facility, within the meaning of 30 Tex. Admin. Code § 335.1(114) & (115) [40 C.F.R. § 260.10]. Since February  2019, PMNA has been an owner and/or operator of the Facility, within the meaning of 30 Tex. Admin. Code § 335.1(114) & (115) [40 C.F.R. § 260.10].

71.     At all times relevant to this action, Defendants did not have a permit or interim

19

status for the treatment, storage, or disposal of hazardous waste in any surface impoundment at the Facility.

72.     As set forth below, Defendants have violated the statutory and regulatory requirements applicable to the management and disposal of solid and/or hazardous waste found in the Texas Solid Waste Disposal Act, Tex. Health & Safety Code ch. 361, and the rules and regulations promulgated thereunder at 30 Tex. Admin. Code ch. 335. (The corresponding federal citations are Sections 3004 and 3005 of RCRA, 42 U.S.C. §§ 6924, 6925, and the regulations promulgated thereunder, including 40 C.F.R. Parts 261, 262, 264, 265, 268 and 270.)

**B.      General Clean Water Act and Texas Water Code Allegations**

73.     Pursuant to Section 402(a) of the CWA, 33 U.S.C. § 1342(a); Tex. Water Code § 26.027, and 30 Tex. Admin. Code ch. 305, the TCEQ issued to DuPont Texas Pollutant Discharge Elimination System ("TPDES") Permit No. TX0006327 (the 2007 TPDES Permit) on January 10, 2007. The 2007 TPDES Permit authorized DuPont to discharge wastewaters through final Outfall 001 after first routing them through internal Outfall 101 or internal Outfall 201. Outfall 101 and Outfall 201 are internal monitoring stations within the treatment system of the Facility, and wastewaters monitored there then flow through Outfall 001, where they exit the Facility and discharge to waters of the United States. The 2007 TPDES Permit specified effluent limitations, monitoring and reporting requirements, and other conditions.

74.     The 2007 TPDES Permit authorized DuPont to route storm water and previously-monitored effluents via internal Outfalls 101 and 201 and discharge them through final Outfall 001. The 2007 TPDES Permit authorized DuPont to discharge treated process wastewater and treated domestic wastewater through final Outfall 001 only if they were first monitored and

routed through internal Outfall 201.

75.     Pursuant to the 2007 TPDES permit, DuPont was authorized to route through internal Outfall 101 recirculated non-contact cooling water, storm water and utility wastewaters (including boiler blowdown and emergency firewater washdown) subject to certain specific effluent limitations identified in the TPDES permit.

76.     The term "non-contact cooling water" is defined in 40 C.F.R. § 401.11(o) as "water used for cooling which does not come into direct contact with any raw material, intermediate product, water product or finished product." The effluent guidelines and standards in 40 C.F.R. Part 401 are adopted by reference at 30 Tex. Admin. Code § 305.

77.     The term "process wastewater" is defined in 40 C.F.R. § 122.2 and 30 Tex. Admin. Code § 305.2(30) to mean "any water which, during manufacturing or processing, comes into direct contact with or results from the production or use of any raw material, intermediate product, finished product, byproduct, or waste product."

78.     At all times relevant to this action, Outfall 001 discharged into the Sabine River Tidal Segment, Segment No. 0501, of the Sabine River Basin.

79.     The 2007 TPDES Permit required DuPont to monitor its pollutant discharge from the Facility. The results of this pollutant monitoring were required to be submitted on a monthly basis to TCEQ in the form of a Discharge Monitoring Report ("DMR").

80.     At all times relevant to this action, DuPont submitted DMRs to the TCEQ pursuant to its 2007 TPDES Permit.

81.     On October 1, 2010, DuPont submitted an application for a revised TPDES permit. Since the application was timely filed, the 2007 TPDES Permit remained in full force

and effect until the TCEQ's action on the application was final. 30 Tex. Admin. Code § 305.65(4).

82.     TCEQ issued final TPDES Permit No. TX0006327 to DuPont on February 16, 2015 (the 2015 TPDES Permit), at which time the 2007 TPDES Permit was superseded.

83.     On February 15, 2019, TCEQ transferred the 2015 TPDES Permit to PMNA as the new owner and operator of the Facility.

## C.     General Clean Air Act Allegations

84.     The Facility is a "major source" as that term is defined at Section 112(a)(1) of the CAA, 42 U.S.C. § 7412(a)(1).

85.     The Facility generates benzene-containing waste streams and is, therefore, subject to the BWON regulations set forth at 40 C.F.R. Part 61, Subpart FF.

86.     The total annual quantity of benzene emissions from Facility waste is equal to or greater than 10 Mg/yr (11 tons/yr).

87.     The C, D and G units at the Facility are subject to the MON and emit gas to multiple process vents. Several such process vents meet the MON definition of Group 1 continuous process vents or Group 1 batch process vents [40 C.F.R. § 63.2550] and were, therefore, subject to the MON as of May 10, 2008. 40 C.F.R. § 63.2445(b).

88.     Defendant holds nine Federal Operating Permits ("FOPs") for the emission of air contaminants at the Facility:

            a.      FOP 1895, which applies to the Barge Dock Facility;

            b.      FOP 1896, which applies to the Sabine Regional Incinerator;

            c.      FOP 1899, which applies to Site Services;

    d.     FOP 1900, which applies to the Biopond Unit;

    e.     FOP 1901, which applies to the Copolymer Specialties Division (CSD);

    f.     FOP 2001, which applies to the C Unit;

    g.     FOP 2055, which applies to the D/G Unit;

    h.     FOP 2074, which applies to Ethylene Unit; and

    i.     FOP 2331, which applies to the Cogeneration Unit.

89.    Each FOP is issued in accordance with, and is subject to, the Texas Clean Air Act, Tex. Health & Safety Code ch. 382, and 30 Tex. Admin. Code ch. 122 ("Federal Operating Permits Program").

90.    Each FOP includes Special Terms and Conditions ("ST&C").

91.    Each FOP requires compliance with the law and regulations applicable to the permitted facility or unit and thus, generally, any violation of the applicable law or regulation is also a violation of the FOP.

92.    A FOP does not relieve the permit holder from the responsibility of obtaining New Source Review ("NSR") authorization for new, modified, or existing facilities in accordance 30 Tex. Admin. Code ch. 116 ("Control of Air Pollution by Permits for New Construction or Modification").

93.    The sites and emission units authorized by a FOP must be operated in accordance with 30 Tex. Admin. Code ch. 122 and the general terms and conditions, special terms and conditions, and attachments contained in the FOP.

94.    On or about March 16, 2019, TCEQ transferred the Facility FOPs to PMNA as the new owner and operator of the Facility.

## FIRST CLAIM FOR RELIEF – RCRA
(Failure to Make Hazardous Waste Determinations for Process
Wastewater Discharged into Surface Impoundments at the Facility)

95.     Paragraphs 1 through 94 are realleged and incorporated by reference.

96.     Pursuant to 30 Tex. Admin. Code § 335.62 [40 C.F.R. § 262.11], a person who

generates a solid waste, as defined in 30 Tex. Admin. Code § 335.1(146) [40 C.F.R. § 261.2],

must determine if that waste is hazardous pursuant to 30 Tex. Admin. Code § 335.504, either by

applying the required test method or by applying his or her knowledge of the hazardous

characteristic of the waste in light of the materials or the process used.

97.     Pursuant to 30 Tex. Admin. Code § 335.70 [40 C.F.R. § 262.40(c)], the record of

a hazardous waste determination must be maintained for at least three years from the date the

waste was last sent to on-site or off-site treatment, storage or disposal.

98.     Based on information obtained during EPA's inspections, process wastewaters

generated by DuPont were disposed into surface impoundments at the Facility, including the

Third Street Wood-Lined Ditch, the East Conduit and the Shell Pit. Subject to a reasonable

opportunity for further investigation or discovery, Defendants have continued to dispose of

process wastewaters into these surface impoundments.

99.     Process wastewaters generated by Defendants are considered "solid waste"

pursuant to 30 Tex. Admin. Code § 335.1(146) [40 C.F.R. § 261.2].

100.    Defendants' pH meters are installed downstream of numerous process waste

discharge points into the surface impoundments, including the Third Street Wood-Lined Ditch,

the East Conduit and the Shell Pit. These meters recorded pH readings of less than 2 or greater

than 12.5 on numerous days between 2005 and 2015. Subject to a reasonable opportunity for

24

further investigation or discovery, these meters have continued to record pH readings of less than 2 or greater than 12.5 on occasions from 2015 to the present.

101.    Solid waste with pH readings of less than 2 or greater than 12.5 is a hazardous waste due to the characteristic of corrosivity, EPA Hazardous Waste Code D002. 30 Tex. Admin. Code § 335.1(73) [40 C.F.R. § 261.22].

102.    Subject to reasonable opportunity for further investigation or discovery, from at least the date of the 2009 Inspection to the present, Defendants have failed to make and document adequate hazardous waste determinations for the process waste streams entering the Third Street Wood-Lined Ditch, the East Conduit and the Shell Pit.

103.    Subject to reasonable opportunity for further investigation or discovery, from at least the date of the 2009 Inspection to the present, Defendants have failed to make and document hazardous waste determinations to determine whether other process wastewaters generated at the Facility were hazardous waste prior to discharging the wastewaters into surface impoundments at the Facility.

104.    Defendants have violated 30 Tex. Admin. Code §§ 335.62 and 335.504 [40 C.F.R. § 262.11] by failing to make hazardous waste determinations for process wastewaters that were disposed into surface impoundments at the Facility, and violated 30 Tex. Admin. Code § 335.70 [40 C.F.R. § 262.40(c)], by failing to maintain records of such hazardous waste determinations. Subject to reasonable opportunity for further investigation or discovery, PMNA continues to violate these requirements. Each failure to comply with the hazardous waste determination requirements for each process wastewater stream constitutes a separate violation for which relief is sought.

105.     Pursuant to Section 3008(a) and (g) of RCRA, 42 U.S.C. § 6928(a) and (g), Defendants are liable to the United States for civil penalties for each violation occurring during their respective periods of ownership and operation of the Facility, and PMNA is liable for injunctive relief.

106.     Pursuant to Sections 7.032, 7.101, 7.102 and 7.105 of the Texas Water Code, Tex. Water Code §§ 7.032, 7.101, 7.102 and 7.105, Defendants are also liable to the State for civil penalties for each violation occurring during their respective periods of ownership and operation of the Facility, and PMNA is liable for injunctive relief.

## SECOND CLAIM FOR RELIEF - RCRA
(Treatment, Storage and Disposal of Hazardous Waste in the
Third Street Wood-Lined Ditch Without a Permit)

107.     Paragraphs 1 through 94 are realleged and incorporated herein by reference.

108.     Pursuant to Sections 3005(a) and (e) of RCRA, 42 U.S.C. §§ 6925(a) and (e), and 30 Tex. Admin. Code §§ 335.2(a) and 335.43(a) [40 C.F.R. § 270.1(c)], a permit is required for the processing (treatment), storage, or disposal of hazardous waste.

109.     Solid waste with a pH of less than 2 or greater than 12.5 is a hazardous waste due to the characteristic of corrosivity, EPA Hazardous Waste Code D002. 30 Tex. Admin. Code § 335.1(73) [40 C.F.R. § 261.22].

110.     DuPont's records show that, for the period from at least 2005 to 2015, DuPont disposed of D002 hazardous waste into the Third Street Wood-Lined Ditch. Subject to reasonable opportunity for further investigation or discovery, Defendants have continued to dispose of hazardous waste in violation of these requirements.

111.     To date, Defendants have neither applied for nor received a RCRA permit to

allow the disposal of hazardous waste into the Third Street Wood-Lined Ditch.

112.    Defendants have violated Sections 3005(a) and (e) of RCRA, 42 U.S.C.
§§ 6925(a) and (e), and 30 Tex. Admin. Code §§ 335.2(a) and 335.43(a) [40 C.F.R. § 270.1(c)],
by disposing of hazardous waste into the Third Street Wood-Lined Ditch without a permit or
interim status. Each day of each unauthorized treatment, storage or disposal of hazardous waste
in the Third Street Wood-Lined Ditch is a separate violation.

113.    Pursuant to Section 3008(a) and (g) of RCRA, 42 U.S.C. § 6928(a) and (g),
Defendants are liable to the United States for civil penalties for each violation occurring during
their respective periods of ownership and operation of the Facility, and PMNA is liable for
injunctive relief.

114.    Pursuant to Sections 7.032, 7.101, 7.102 and 7.105 of the Texas Water Code, Tex.
Water Code §§ 7.032, 7.101, 7.102 and 7.105, Defendants are also liable to the State for civil
penalties for each violation occurring during their respective periods of ownership and operation
of the Facility, and PMNA is liable for injunctive relief.

## THIRD CLAIM FOR RELIEF - RCRA
(Disposal of Hazardous Waste into the Third Street
Wood-Lined Ditch in Violation of the Land Disposal Prohibition)

115.    Paragraphs 1 through 94 are realleged and incorporated herein by reference.

116.    30 Tex. Admin. Code § 335.431(c)(1) adopts by reference the regulations
contained in 40 C.F.R. Part 268.  Pursuant to 30 Tex. Admin. Code § 335.431(c)(1) [40 C.F.R.
§ 268.40], D002 hazardous waste is prohibited from land disposal unless the generator treats the
waste in accordance with the treatment standards set forth at 40 C.F.R. § 268.40. 40 C.F.R.
§ 268.40(a) further provides that a prohibited waste in the table "Treatment Standards for

27

Hazardous Wastes" may be land disposed only if it meets the requirements found in the table.

117.   Placement of hazardous waste in a surface impoundment constitutes land disposal within the meaning of that term as set forth at 40 C.F.R. § 268.2(c).

118.   DuPont's records show that for the period from at least 2005 to 2015, DuPont disposed of D002 hazardous waste in the Third Street Wood-Lined Ditch without meeting the required treatment standards, in violation of 30 Tex. Admin. Code § 335.431(c)(1) [40 C.F.R. § 268.40]. Subject to reasonable opportunity for further investigation or discovery, Defendants have continued to dispose of hazardous waste in violation of these requirements. Each day of each unauthorized treatment, storage or disposal of hazardous waste in the Third Street Wood-Lined Ditch is a separate violation of the land disposal restrictions.

119.   Pursuant to Section 3008(a) and (g) of RCRA, 42 U.S.C. § 6928(a) and (g), Defendants are liable to the United States for civil penalties for each violation occurring during their respective periods of ownership and operation of the Facility, and PMNA is liable for injunctive relief.

120.   Pursuant to Sections 7.032, 7.101, 7.102 and 7.105 of the Texas Water Code, Tex. Water Code §§ 7.032, 7.101, 7.102 and 7.105, Defendants are also liable to the State for civil penalties for each violation occurring during their respective periods of ownership and operation of the Facility, and PMNA is liable for injunctive relief.

## FOURTH CLAIM FOR RELIEF - RCRA
### (Treatment, Storage and Disposal of Hazardous Waste in the East Conduit Without a Permit)

121.   Paragraphs 1 through  are realleged and incorporated herein by reference.

122.   Pursuant to Sections 3005(a) and (e) of RCRA, 42 U.S.C. §§ 6925(a) and (e), and

30 Tex. Admin. Code §§ 335.2(a) and 335.43(a) [40 C.F.R. § 270.1(c)], a permit is required for the processing (treatment), storage, or disposal of hazardous waste.

123.    Solid waste with a pH of less than 2 or greater than 12.5 is a hazardous waste due to the characteristic of corrosivity, EPA Hazardous Waste Code D002. 30 Tex. Admin. Code § 335.1(73) [40 C.F.R. § 261.22].

124.    The East Conduit is part of the wastewater treatment system and is that portion of the drainage system along Third Street that drains to the east and discharges into the Mixing Pond.

125.    The East Conduit receives wastewaters from numerous process areas. A mixing cell located in the East Conduit mixes and neutralizes the pH of the wastewater before sending the mixture to a receiving pond. DuPont reported pH concentrations of less than 2.0 or greater than 12.5 pH units in the East Conduit. The pH readings were measured by meters installed in the East Conduit down-gradient from the discharge areas noted above.

126.    DuPont's records show that DuPont disposed of D002 hazardous waste in the East Conduit during the period from at least 2005 through 2015. Subject to reasonable opportunity for further investigation or discovery, Defendants continued to dispose of hazardous waste there in violation of requirements.

127.    To date, Defendants have neither applied for nor received a RCRA permit to allow the disposal of hazardous waste into the East Conduit.

128.    Defendants violated Sections 3005(a) and (e) of RCRA, 42 U.S.C. §§ 6925(a) and (e); and 30 Tex. Admin. Code §§ 335.2(a) and 335.43(a) [40 C.F.R. § 270.1(c)], by disposing of hazardous waste in the East Conduit without a permit or interim status. Each day of each

unauthorized treatment, storage or disposal of hazardous waste in the East Conduit constitutes a separate violation for which relief is sought.

129.    Pursuant to Section 3008(a) and (g) of RCRA, 42 U.S.C. § 6928(a) and (g), Defendants are liable to the United States for civil penalties for each violation occurring during their respective periods of ownership and operation of the Facility, and PMNA is liable for injunctive relief.

130.    Pursuant to Sections 7.032, 7.101, 7.102 and 7.105 of the Texas Water Code, Tex. Water Code §§ 7.032, 7.101, 7.102 and 7.105, Defendants are also liable to the State for civil penalties for each violation occurring during their respective periods of ownership and operation of the Facility, and PMNA is liable for injunctive relief.

## FIFTH CLAIM FOR RELIEF - RCRA
(Disposal of Hazardous Waste into the East Conduit
in Violation of the Land Disposal Prohibition)

131.    Paragraphs 1 through 94 are realleged and incorporated herein by reference.

132.    30 Tex. Admin. Code § 335.431(c)(1) adopts by reference the regulations contained in 40 C.F.R. Part 268. Pursuant to 30 Tex. Admin. Code § 335.431(c)(1) [40 C.F.R. § 268.40], D002 hazardous waste is prohibited from land disposal unless the generator treats the waste in accordance with the treatment standards set forth at 40 C.F.R. § 268.40. 40 C.F.R. § 268.40(a) further provides that a prohibited waste in the table "Treatment Standards for Hazardous Wastes" may be land disposed only if it meets the requirements found in the table.

133.    Placement of hazardous waste in a surface impoundment constitutes land disposal within the meaning of that term as set forth at 40 C.F.R. § 268.2(c).

134.    DuPont's records show that for the period from at least 2005 to 2015 DuPont

disposed of D002 hazardous waste in the East Conduit from certain process units without meeting the required treatment standards, in violation of land disposal regulations at 30 Tex. Admin. Code § 335.431(c)(1) [40 C.F.R. § 268.40]. Subject to reasonable opportunity for further investigation or discovery, Defendants continued to dispose of hazardous waste in violation of these requirements. Each day of each unauthorized treatment, storage or disposal of hazardous waste in the East Conduit constitutes a separate violation of the land disposal restrictions for which relief is sought.

135.    Pursuant to Section 3008(a) and (g) of RCRA, 42 U.S.C. § 6928(a) and (g), Defendants are liable to the United States for civil penalties for each such violation occurring during their respective periods of ownership and operation of the Facility, and PMNA is liable for injunctive relief.

136.    Pursuant to Sections 7.032, 7.101, 7.102 and 7.105 of the Texas Water Code, Tex. Water Code §§ 7.032, 7.101, 7.102 and 7.105, Defendants are also liable to the State for civil penalties for each violation occurring during their respective periods of ownership and operation of the Facility, and PMNA is liable for injunctive relief.

### SIXTH CLAIM FOR RELIEF - RCRA
(Treatment, Storage and Disposal of Hazardous Waste in the
Shell Pit Without a Permit)

137.    Paragraphs 1 through 94 are realleged and incorporated by reference.

138.    On or about July 26, 2008, October 20-21, 2008, and December 12, 2008, DuPont disposed of maintenance waste transported by vacuum trucks into the Shell Pit. These discarded wastewaters constitute "solid wastes" pursuant to 30 Tex. Admin. Code § 335.1(146) [40 C.F.R. § 261.2].

139.     According to DuPont's records, the wastewaters disposed into the Shell Pit had pH readings of less than 2 or greater than 12.5.

140.     Solid waste with pH readings of less than 2 or greater than 12.5 is a hazardous waste due to the characteristic of corrosivity, EPA Hazardous Waste Code D002. 30 Tex. Admin. Code § 335.1(73) [40 C.F.R. § 261.22].

141.     To date, Defendants have neither applied for nor received a RCRA permit to allow the disposal of hazardous waste into the Shell Pit.

142.     Defendants have violated Sections 3005(a) and (e) of RCRA, 42 U.S.C. §§ 6925(a) and (e); and 30 Tex. Admin. Code §§ 335.2(a) and 335.43(a) [40 C.F.R. § 270.1(c)], by disposing of hazardous waste in the Shell Pit without a permit or interim status. Each day of each unauthorized treatment, storage or disposal of hazardous waste in the Shell Pit constitutes a separate violation for which relief is sought.

143.     Pursuant to Section 3008(a) and (g) of RCRA, 42 U.S.C. § 6928(a) and (g), Defendants are liable to the United States civil penalties for each violation occurring during their respective periods of ownership and operation of the Facility, and PMNA is liable for injunctive relief.

144.     Pursuant to Sections 7.032, 7.101, 7.102 and 7.105 of the Texas Water Code, Tex. Water Code §§ 7.032, 7.101, 7.102 and 7.105, Defendant is also liable to the State for civil penalties for each violation occurring during their respective periods of ownership and operation of the Facility, and PMNA is liable for injunctive relief.

## SEVENTH CLAIM FOR RELIEF - RCRA
(Disposal of Hazardous Waste into the Shell Pit in Violation of the
Land Disposal Prohibition)

145.     Paragraphs 1 through 94 are realleged and incorporated herein by reference.

146.     30 Tex. Admin. Code § 335.431(c)(1) adopts by reference the regulations
contained in 40 C.F.R. Part 268.  Pursuant to 30 Tex. Admin. Code § 335.431(c)(1) [40 C.F.R.
§ 268.40], D002 hazardous waste is prohibited from land disposal unless the generator treats the
waste in accordance with the treatment standards set forth at 40 C.F.R. § 268.40. 40 C.F.R.
§ 268.40(a) further provides that a prohibited waste in the table "Treatment Standards for
Hazardous Wastes" may be land disposed only if it meets the requirements found in the table.

147.     Placement of hazardous waste in a surface impoundment constitutes land disposal
within the meaning of that term as set forth at 40 C.F.R. § 268.2(c).

148.     On or about July 26, 2008, October 20-21, 2008, and December 12, 2008, DuPont
disposed of D002 hazardous waste in the Shell Pit without meeting the required treatment
standards, in violation of land disposal regulations at 30 Tex. Admin. Code § 335.431(c)(1) [40
C.F.R. § 268.40]. Each day of each unauthorized treatment, storage or disposal of hazardous
waste in the Shell Pit constitutes a separate violation of the land disposal restrictions for which
relief is sought.

149.     Pursuant to Section 3008(a) and (g) of RCRA, 42 U.S.C. § 6928(a) and (g),
Defendants are liable to the United States for civil penalties for each violation occurring during
their respective periods of ownership and operation of the Facility, and PMNA is liable for
injunctive relief.

150.     Pursuant to Sections 7.032, 7.101, 7.102 and 7.105 of the Texas Water Code, Tex.

Water Code §§ 7.032, 7.101, 7.102 and 7.105, Defendants are also liable to the State for civil penalties for each violation occurring during their respective periods of ownership and operation of the Facility, and PMNA is liable for injunctive relief.

### EIGHTH CLAIM FOR RELIEF – RCRA
(Failure to have Financial Assurance for Closure of the Third
Street Wood-Lined Ditch, East Conduit and Shell Pit)

151.    Paragraphs 1 through 94 are realleged and incorporated herein by reference.

152.    Pursuant to 30 Tex. Admin. Code §§ 37.6021, 335.179(b), and 335.128(a), [40 C.F.R. §§ 264.143 and 265.143], the owner and operator of each hazardous waste facility must establish financial assurance for closure of the facility. The owner or operator must choose from the options set forth in 30 Tex. Admin. Code §§ 37.6021, 335.179(b), and 335.128(a) [40 C.F.R. §§ 264.143(a)-(f) and 265.143(a)-(f)].

153.    Defendants have not established financial assurance for the closure of the Third Street Wood-Lined Ditch, the East Conduit and the Shell Pit, in violation of 30 Tex. Admin. Code §§ 37.6021, 335.179(b), and 335.128(a) [40 C.F.R. §§ 264.143 and 265.143]. Subject to reasonable opportunity for further investigation or discovery, PMNA continues to violate these requirements. Each failure to establish financial assurance for closure of a surface impoundment constitutes a separate violation.

154.    Pursuant to Section 3008(a) and (g) of RCRA, 42 U.S.C. § 6928(a) and (g), Defendants are liable to the United States for civil penalties for each violation occurring during their respective periods of ownership and operation of the Facility, and PMNA is liable for injunctive relief.

155.    Pursuant to Sections 7.032, 7.101, 7.102 and 7.105 of the Texas Water Code, Tex.

34

Water Code §§ 7.032, 7.101, 7.102 and 7.105, Defendants are also liable to the State for civil penalties for each violation occurring during their respective periods of ownership and operation of the Facility, and PMNA is liable for injunctive relief.

## NINTH CLAIM FOR RELIEF – CWA
(Unauthorized Discharge of Process Wastewater from C, D, and G Units)

156.    Paragraphs 1 through 94 are realleged and incorporated herein by reference.

157.    DuPont routed process wastewater from the C, D, and G low-density Units to the Fifth Street Wood-Lined Ditch. Specifically, DuPont routed process wastewater to the Fifth Street Wood-Lined Ditch from the following units: the C Unit pellet skimmer and floor drains, the D Unit Floor Drains, and the G Unit oil and water separator and floor drains. The cooling water recirculation system does not have a process to treat process wastewater from the C, D and G Units.

158.    The Fifth Street Wood-Lined Ditch is part of the cooling water re-circulating system, and flow from the Fifth Street Wood-Lined Ditch is routed through a canal to the North Water Reservoir, which is a component of the Fresh Water Reservoir.

159.    By introducing process wastewater originating in the C, D, and G Units into the cooling water recirculation system, DuPont mixed process wastewater and non-contact cooling water in the cooling water recirculation system, which includes the Fresh Water Reservoir.

160.    Intermittently, DuPont routed non-contact cooling water mixed with process wastewater through Internal Outfall 101. EPA's review of DuPont's records from 2006-2008 indicate at least 30 days on which DuPont routed non-contact cooling water mixed with process wastewater through Internal Outfall 101. After passing through Internal Outfall 101, the mixture discharged through Outfall 001.

161.    The 2007 TPDES Permit did not authorize DuPont to route process wastewater from the C, D and G Units through Internal Outfall 101 and then discharge it through Outfall 001.

162.    Each unauthorized discharge of pollutants in violation of the 2007 TPDES Permit by DuPont constituted a separate violation of its 2007 TPDES Permit and a separate violation of Section 26.121 of the Texas Water Code, Tex. Water Code § 26.121. Subject to reasonable opportunity for further investigation or discovery, DuPont continued to route untreated process wastewater periodically through Outfall 101 and then discharge it through Outfall 001 during the life of its 2007 Permit.

163.    Pursuant to Section 309(b) and (d) of the CWA, 33 U.S.C. § 1319(b) and (d), DuPont is liable to the United States for civil penalties for each violation of the 2007 TPDES Permit referenced above.

164.    Pursuant to Sections 7.032, 7.101, 7.102 and 7.105 of the Texas Water Code, Tex. Water Code §§ 7.032, 7.101, 7.102 and 7.105, DuPont is also liable to the State for civil penalties for each violation.

## TENTH CLAIM FOR RELIEF - CWA
### (Unauthorized Discharge of Process Wastewater from Sludge Settling Basin)

165.    Paragraphs 1 through 94 are realleged and incorporated herein by reference.

166.    DuPont routed Ethylene Cooling Tower filter backwash solids and Water Plant Clarifier sludge water to the Sludge Settling Basin.

167.    Wastewater from the Sludge Settling Basin, which is "process wastewater," enters the cooling water recirculation system through a culvert at the South Cooling Water Reservoir (308-2A), which is a component of the Fresh Water Reservoir.

168.     The cooling water recirculation system does not treat process wastewater from the Sludge Settling Basin.

169.     By introducing process wastewater originating in the Sludge Settling Basin into the cooling water recirculation system, DuPont mixed process wastewater and non-contact cooling water in the cooling water recirculation system, which includes the Fresh Water Reservoir.

170.     Intermittently, DuPont routed non-contact cooling water mixed with process wastewater through Internal Outfall 101. EPA's review of DuPont's records from 2006-2008 indicate at least 30 days on which DuPont routed non-contact cooling water mixed with process wastewater through Internal Outfall 101 and then discharged it through Outfall 001.

171.     The 2007 TPDES Permit did not authorize DuPont to route process wastewater from the Sludge Settling Basin through Internal Outfall 101 and then discharge it through Outfall 001.

172.     Each unauthorized discharge of pollutants in violation of the 2007 TPDES Permit by DuPont constituted a separate violation of its 2007 TPDES Permit and of Section 26.121 of the Texas Water Code, Tex. Water Code § 26.121. Subject to reasonable opportunity for further investigation or discovery, DuPont continued to route untreated process wastewater periodically through Outfall 101 and then discharge it through Outfall 001 during the life of its 2007 Permit.

173.     Pursuant to Section 309(b) and (d) of the CWA, 33 U.S.C. § 1319(b) and (d), DuPont is liable to the United States for civil penalties for each violation of the 2007 TPDES Permit referenced above.

174.     Pursuant to Sections 7.032, 7.101, 7.102 and 7.105 of the Texas Water Code, Tex.

Water Code §§ 7.032, 7.101, 7.102 and 7.105, DuPont is also liable to the State for civil penalties for each violation.

## ELEVENTH CLAIM FOR RELIEF - CWA
### (Unauthorized Discharge of Treated Domestic Wastewater)

175.    Paragraphs 1 through 94 are realleged and incorporated herein by reference.

176.    DuPont routed treated domestic wastewater to the cooling water recirculation system by routing treated domestic wastewater to the Middle Cooling Water Reservoir (308-2B), which is a component of the Fresh Water Reservoir.

177.    By introducing treated domestic wastewater into the cooling water recirculation system, DuPont mixed treated domestic wastewater and non-contact water in the cooling water recirculation system, including the Fresh Water Reservoir.

178.    Intermittently, DuPont routed non-contact cooling water mixed with treated domestic wastewater through Internal Outfall 101. EPA's review of DuPont's records from 2006-2008 indicate at least 30 days on which DuPont routed non-contact cooling water that had been mixed with treated domestic wastewater through Internal Outfall 101 and then discharged it through Outfall 001.

179.    The 2007 TPDES Permit did not authorize DuPont to route treated domestic wastewater through Internal Outfall 101 and then discharge it through Outfall 001.

180.    Each unauthorized discharge of pollutants in violation of the 2007 TPDES Permit by DuPont constitutes a separate violation of the 2007 TPDES Permit and of Section 26.121 of the Texas Water Code, Tex. Water Code § 26.121. Subject to reasonable opportunity for further investigation or discovery, DuPont continued to route untreated process wastewater periodically through Outfall 101 and then discharge it through Outfall 001 during the life of its 2007 Permit.

181.     Pursuant to Section 309(b) and (d) of the CWA, 33 U.S.C. § 1319(b) and (d), DuPont is liable to the United States for civil penalties for each violation of the 2007 TPDES Permit referenced above.

182.     For each such violation, pursuant to Sections 7.032, 7.101, 7.102 and 7.105 of the Texas Water Code, Tex. Water Code §§ 7.032, 7.101, 7.102 and 7.105, DuPont is also liable to the State for civil penalties.

### TWELFTH CLAIM FOR RELIEF – CWA
(Failure to Accurately Report Sampling Results)

183.     Paragraphs 1 through 94 are realleged and incorporated herein by reference.

184.     Pursuant to the 2007 TPDES Permit, Monitoring and Reporting Requirements Section, Paragraph 4 (Additional Monitoring by Permittee), if the permittee [DuPont] monitors any pollutant at the location(s) designated in the permit more frequently than required by the Permit using approved analytical methods, all results of such monitoring shall be included in the calculation and the values shall be reported on the approved self-report form. The 2015 TPDES Permit also requires this monitoring protocol.

185.     Pursuant to the 2007 TPDES Permit, page 2e (Effluent Limitations and Monitoring Requirements, Outfall Number 201), DuPont was required to take daily grab samples for pH at Outfall 201. The 2015 TPDES Permit also requires this sampling at Outfall 201.

186.     DuPont routinely obtained the daily grab sample for pH at 6:00 a.m. from Internal Outfall 201 and routinely reported compliance with the pH levels for Internal Outfall 201 in its monthly DMR to TCEQ.

187.     DuPont also monitored the pH from the C-1 culvert, which is approximately 200 yards upstream from Internal Outfall 201. The monitor at the C-1 culvert takes minute-to-minute

readings of the pH levels.

188.    There is no form of treatment or commingling of waste streams between Internal Outfall 201 and the C-1 culvert.

189.    Since at least 2006, readings taken from the monitor located at the C-1 culvert have shown that the pH in the waste stream exceeded the permit limits for Outfall 201 on thousands of occasions. These pH exceedances commonly occurred between the hours of 12:00 p.m. and 5:00 p.m. By failing to include the pH readings taken upstream at the C-1 culvert in its DMR, DuPont failed to report representative samples at Outfall 201.

190.    In or about 2013, DuPont installed an AquaTROLL water quality meter in a different location upstream of Outfall 201 and began using that meter instead of the C-1 Culvert meter to monitor pH in the waste stream entering Outfall 201. During the 2015 Inspection, EPA found that the readings at the new location frequently exceeded the permit limit for Outfall 201. By failing to include the pH readings taken upstream at the AquaTROLL meter in its DMR, DuPont failed to report representative samples at Outfall 201.

191.    Each occasion that DuPont submitted a DMR for Outfall 201 without including the pH readings obtained from the upstream sampling at the C-1 culvert or from the AquaTROLL meter is a violation of the requirements of 2007 TPDES Permit, Monitoring and Reporting Requirements Section, Paragraph 4 (Additional Monitoring by Permittee), or the 2015 TPDES Permit, as applicable, and a violation of Section 26.121 of the Texas Water Code, Tex. Water Code § 26.121. Subject to a reasonable opportunity for further investigation or discovery, Defendants have continued to violate these requirements of the 2015 TPDES Permit.

192.    Pursuant to Section 309(b) and (d) of the CWA, 33 U.S.C. § 1319(b) and (d),

Defendants are liable to the United States for civil penalties for each violation of the 2007 TPDES Permit or 2015 TPDES Permit, as applicable, occurring during their respective periods of ownership and operation of the Facility, and PMNA is liable for injunctive relief.

193.    For each such violation, pursuant to Sections 7.032, 7.101, 7.102 and 7.105 of the Texas Water Code, Tex. Water Code §§ 7.032, 7.101, 7.102 and 7.105, Defendants are also liable to the State for civil penalties for violations occurring during their respective periods of ownership and operation of the Facility, and PMNA is liable for injunctive relief.

## THIRTEENTH CLAIM FOR RELIEF – CWA
(Failure to Comply with Permit Conditions for Pond System)

194.    Paragraphs 1 through 94 are realleged and incorporated herein by reference.

195.    When applying for reissuance of DuPont's TPDES Permit, which eventually was issued as the 2015 TPDES Permit, DuPont submitted its Application for Permit Renewal to TCEQ. In the Application for Permit Renewal, DuPont described its biological treatment impoundments as follows: "[t]hese impoundments include three anaerobic/anoxic biological treatment impoundments followed by four aerobic biological treatment impoundments."

196.    The anaerobic or aerobic nature of a biological treatment pond affects its ability to adequately treat wastewaters and ensure compliance with effluent limitations.

197.    In DuPont's permit application, the 27-acre Pond, Northwest Pond, and 16-acre Pond are all identified as anaerobic/anoxic, and the Northeast Pond, Southeast Pond, and Southwest Pond are all identified as aerobic.

198.    DuPont routinely collected data on the aerobic or anoxic levels in its biological treatment impoundments pursuant to the 2007 and 2015 Permits. EPA reviewed DuPont's data during the 2015 Inspection, and the data shows that the pond system is not working as described

41

in the permit application. In particular, at the time of EPA's inspections the three ponds listed as aerobic in the permit application did not maintain conditions sufficient for aerobic activity to occur, thereby inhibiting the pond system's ability to properly degrade wastes as necessary to ensure continuing compliance with permit limits.

199.    As stated in the 2015 TPDES Permit, in Paragraph 1(b) of the Permit Conditions Section, the permit was granted on the basis of the information supplied and representations made by DuPont, and in reliance upon the accuracy and completeness of the information and representations. Failure to disclose fully all relevant facts is grounds for modifying, suspending, or revoking the permit in whole or in part.

200.    The 2015 TPDES Permit, in Paragraph 10 of the Permit Conditions Section, provides that "[t]he application pursuant to which the permit has been issued is incorporated herein."

201.    The 2015 TPDES Permit, in Paragraph 1(a) of the Permit Conditions Section, further provides that the Permittee has an obligation to promptly correct inaccurate facts and missing information on a permit application.

202.    DuPont did not promptly inform TCEQ of the inaccuracies on its application regarding the design or operation of the biological treatment impoundments.

203.    The 2015 TPDES Permit, in Paragraph 2(b) of the Permit Conditions Section, provides that the Permittee has a duty to comply with all conditions of the permit and that failure to comply with any permit condition constitutes a violation of the permit and grounds for enforcement action.

204.    By failing to promptly correct inaccuracies in its permit application to TCEQ,

DuPont violated the permit conditions and, therefore, violated the 2015 TPDES Permit and Section 26.121 of the Texas Water Code, Tex. Water Code § 26.121. Subject to a reasonable opportunity for further investigation or discovery, PMNA, as the current Permittee, continues to violate this condition of the 2015 TPDES Permit by not correcting inaccuracies in the information upon which the Permit is based.

205.    Pursuant to Section 309(b) and (d) of the CWA, 33 U.S.C. § 1319(b) and (d), Defendants are liable to the United States for civil penalties for each such violation occurring during their respective periods of ownership and operation of the Facility, and PMNA is liable for injunctive relief.

206.    For each such violation, pursuant to Sections 7.032, 7.101, 7.102 and 7.105 of the Texas Water Code, Tex. Water Code §§ 7.032, 7.101, 7.102 and 7.105, Defendants are also liable to the State for civil penalties for violations occurring during their respective periods of ownership and operation of the Facility, and PMNA is liable for injunctive relief.

## FOURTEENTH CLAIM FOR RELIEF – CAA (BWON)
(Failure to Determine the Annual Waste Quantity for Each Benzene
Waste Stream at the Point of Waste Generation for 2006)

207.    Paragraphs 1 through 94 are realleged and incorporated herein by reference.

208.    Pursuant to 40 C.F.R. § 61.355(a), the owner or operator of a chemical manufacturing plant must determine and report the total annual benzene contained in facility waste in accordance with the procedures established therein. Among other requirements, for each covered waste stream the facility must determine the annual waste quantity at the point of waste generation. 40 C.F.R. § 61.355(a)(1)(i) and (b).

209.    "Point of waste generation" is defined in 40 C.F.R. § 61.341 as meaning "the

location where the waste stream exits the process unit component or storage tank prior to handling or treatment in an operation which is not an integral part of the production process, or in the case of waste management units that generate new wastes after treatment, the location where the waste exits the waste management unit component."

210.    "Waste management unit" is defined in 40 C.F.R. § 61.341 as "a piece of equipment, structure, or transport mechanism used in the handling, storage, treatment, or disposal of waste. Examples of a waste management unit include a tank, surface impoundment, container, oil-water separator, individual drain system, steam stripping unit, thin-film evaporation unit, waste incinerator and landfill."

211.    DuPont's 2006 Total Annual Benzene ("TAB") Report states that "the attached TAB does not identify and characterize each and every benzene-containing stream at its potential first point of waste generation."

212.    For calendar year 2006, DuPont failed to determine and report the annual waste quantity for all benzene-containing waste streams at the point of waste generation in violation of 40 C.F.R. §§ 61.355(a)-(b) and 30 Tex. Admin. Code §§ 122.143(4) and 116.115(c).

213.    Each such violation of a rule or order of the TCEQ is also a violation of Tex. Health & Safety Code § 382.085(b).

214.    Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), DuPont is liable to the United States for civil penalties for each such violation.

215.    For each such violation, pursuant to Sections 7.032, 7.101, 7.102 and 7.105 of the Texas Water Code, Tex. Water Code §§ 7.032, 7.101, 7.102 and 7.105, DuPont is also liable to the State for civil penalties.

**FIFTEENTH CLAIM FOR RELIEF – CAA (BWON)**
(Violation of Reporting Requirements for Benzene in 2006 TAB Report)

216.    Paragraphs 1 through 94 are realleged and incorporated herein by reference.

217.    40 C.F.R. § 61.357(d)(2) provides that if the total annual benzene quantity from facility waste is equal to or greater than 10 Mg/yr (11 tons/yr), then the owner or operator must submit an annual TAB Report that contains, among other things, the following information from Section 61.357(a)(2): "[a] table identifying each waste stream and whether or not the waste stream will be controlled for benzene emissions in accordance with [40 C.F.R. Part 61, Subpart FF]."

218.    In its 2006 TAB Report, DuPont failed to identify each waste stream and whether or not the waste stream will be controlled in accordance with 40 C.F.R. Part 61, Subpart FF.

219.    By failing to properly identify all waste streams in its 2006 TAB Report, DuPont violated 40 C.F.R. §§ 61.357(d) and 30 Tex. Admin. Code § 122.143(4).

220.    Each such violation of a rule or order of the TCEQ is also a violation of Tex. Health & Safety Code § 382.085(b).

221.    Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), DuPont is liable to the United States for civil penalties for each such violation.

222.    For each such violation, pursuant to Sections 7.032, 7.101, 7.102 and 7.105 of the Texas Water Code, Tex. Water Code §§ 7.032, 7.101, 7.102 and 7.105, DuPont is also liable to the State for injunctive relief and civil penalties.

**SIXTEENTH CLAIM FOR RELIEF – CAA (BWON)**
(Failure to Determine the Benzene Annual Waste Quantity for Each
Waste Stream at the Point of Waste Generation – Quench Tower)

223.    Paragraphs 1 through 94 are realleged and incorporated herein by reference.

45

224.    Pursuant to 40 C.F.R. § 61.355(a), the owner or operator of a chemical manufacturing plant must determine the total annual benzene quantity contained in facility waste in accordance with the procedures established therein. Among other requirements, the facility must determine the annual waste quantity for each covered waste stream at the point of waste generation. 40 C.F.R. § 61.355(a)(1)(i) and (b).

225.    The Quench Tower used in the ethylene manufacturing process is a "waste management unit" as that term is defined in 40 C.F.R. § 61.341.

226.    The point of generation of this waste management unit is the exit of the Quench Tower.

227.    For calendar years 2006 through 2015, DuPont failed to determine the annual benzene waste quantity for the waste stream exiting the Quench Tower, in violation of 40 C.F.R. §§ 61.355(a)-(b) and 30 Tex. Admin. Code § 122.143(4). Subject to a reasonable opportunity for further investigation or discovery, Defendants have continued to violate these regulations.

228.    Each such violation of a rule or order of the TCEQ is also a violation of Tex. Health & Safety Code § 382.085(b).

229.    Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Defendants are liable to the United States for civil penalties for each violation occurring during their respective periods of ownership and operation of the Facility, and PMNA is liable for injunctive relief.

230.    For each such violation, pursuant to Sections 7.032, 7.101, 7.102 and 7.105 of the Texas Water Code, Tex. Water Code §§ 7.032, 7.101, 7.102 and 7.105, Defendants are also liable to the State for civil penalties for violations occurring during their respective periods of ownership and operation of the Facility, and PMNA is liable for injunctive relief.

46

## SEVENTEENTH CLAIM FOR RELIEF – CAA (BWON)
### (Failure to Include Quench Tower Benzene Waste Stream in
2006 through 2015 TAB Reports)

231.     Paragraphs 1 through 94 are realleged and incorporated herein by reference.

232.     40 C.F.R. § 61.357(d)(2) provides that if the total annual benzene quantity from facility waste is equal to or greater than 10 Mg/yr (11 tons/yr), then the owner or operator must submit an annual report that contains, among other things, the following information from 61.357(a)(2): "[a] table identifying each waste stream and whether or not the waste stream will be controlled for benzene emissions in accordance with [40 C.F.R. Part 61, Subpart FF]."

233.     DuPont failed to identify the Quench Tower Waste Stream in the 2006 through 2015 TAB Reports.

234.     By failing to identify the Quench Tower Waste Stream in the 2006 through 2015 TAB Reports, DuPont violated 40 C.F.R. § 61.357(d)(2) and 30 Tex. Admin. Code § 122.143(4). Subject to a reasonable opportunity for further investigation or discovery, Defendants have continued to violate these regulations.

235.     Each such violation of a rule or order of the TCEQ is also a violation of Tex. Health & Safety Code § 382.085(b).

236.     Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Defendants are liable to the United States for civil penalties for each such violation occurring during their respective periods of ownership and operation of the Facility, and PMNA is liable for injunctive relief.

237.     For each such violation, pursuant to Sections 7.032, 7.101, 7.102 and 7.105 of the Texas Water Code, Tex. Water Code §§ 7.032, 7.101, 7.102 and 7.105, Defendants are also

liable to the State for civil penalties for violations occurring during their respective periods of ownership and operation of the Facility, and PMNA is liable for injunctive relief.

### EIGHTEENTH CLAIM FOR RELIEF – CAA (BWON)
(Failure to Accurately Report Annual Benzene Waste Quantity
for Quench Settler in 2008 through 2016 TAB Reports)

238.    Paragraphs 1 through 94 are realleged and incorporated herein by reference.

239.    40 C.F.R. § 61.357(d)(2) provides that, if the total annual benzene quantity from facility waste is equal to or greater than 10 Mg/yr (11 tons/yr), then the owner or operator must submit an annual TAB Report that contains, among other things, the following information from 61.357(a):

> (2)  A table identifying each waste stream and whether or not the waste stream will be controlled for benzene emissions in accordance with 40 C.F.R. Part 61, Subpart FF; and

> (3)  If a waste stream is identified as being not controlled, the annual waste quantity for the waste stream must be reported.

240.    DuPont reported that the Quench Settler Stream is uncontrolled.

241.    DuPont incorrectly reported in the 2008 through 2016 TAB Reports that the annual waste quantity for the Quench Settler Stream is 1,986 Mg. The correct number is not possible to determine because DuPont did not measure the flow rate of the waste stream, nor did it develop standard procedures for the draining of the Quench Settler Stream to ensure the flow rate of this waste stream is consistent, measurable, and reported accurately.

242.    Therefore, by failing to accurately report the annual waste quantity for the Quench Settler Stream, DuPont violated 40 C.F.R. § 61.357(a)(3)(vi) and (d)(2) and 30 Tex. Admin. Code § 122.143(4). Subject to a reasonable opportunity for further investigation or discovery, Defendants have continued to violate these regulations.

48

243.    Each such violation of a rule or order of the TCEQ is also a violation of Tex. Health & Safety Code § 382.085(b).

244.    Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Defendants are liable to the United States for civil penalties for each such violation occurring during their respective periods of ownership and operation of the Facility, and PMNA is liable for injunctive relief .

245.    For each such violation, pursuant to Sections 7.032, 7.101, 7.102 and 7.105 of the Texas Water Code, Tex. Water Code §§ 7.032, 7.101, 7.102 and 7.105, Defendants are also liable to the State for civil penalties for violations occurring during their respective periods of ownership and operation of the Facility, and PMNA is liable for injunctive relief.

## NINETEENTH CLAIM FOR RELIEF – CAA (BWON)
### (Failure to Comply with Oil-Water Separator Requirements at Quench Settler)

246.    Paragraphs 1 through 94 are realleged and incorporated herein by reference.

247.    Pursuant to 40 C.F.R. § 61.347(a)(1), the owner or operator of an oil-water separator shall install, operate, and maintain a fixed roof and closed-vent system that routes all organic vapors vented from the oil-water separator to a control device.

248.    "Oil-water separator" is defined in 40 C.F.R. § 61.341 as meaning "a waste management unit, generally a tank or surface impoundment, used to separate oil from water."

249.    Defendants use a device called a Quench Settler in the ethylene manufacturing process to separate the entrained organic liquids from aqueous liquids in the used quench water.

250.    The Quench Settler is an "oil-water separator" as that term is defined in 40 C.F.R. § 61.341.

251.    Pursuant to 40 C.F.R. § 61.347(a)(1)(i), the fixed roof of an oil-water separator

shall meet several requirements, including a requirement that the cover and all openings be designed to operate with no detectable emissions, as determined through initial and annual tests in accordance with 40 C.F.R. § 61.355(h), and a requirement that each opening be maintained in a closed, sealed position at all times that waste is in the oil-water separator.

252.    40 C.F.R. § 61.347(b) requires that each cover seal, access hatch, and all other openings be checked by visual inspections initially and quarterly thereafter to ensure that no cracks or gaps occur between the cover and the oil-water separator wall, and that the access hatches and other openings are closed and gasketed properly.

253.    From at least the date of the 2009 Inspection through the 2015 Inspection, DuPont failed to conduct initial or annual monitoring at the Quench Settler to determine whether the cover and all openings operate with no detectable emissions using the method set forth in 40 C.F.R. § 61.355(h). DuPont also failed to conduct the initial or quarterly inspections to ensure that no cracks or gaps occur between the cover and the oil-water separator wall, and that access hatches and other openings are closed and gasketed properly. Subject to a reasonable opportunity for further investigation or discovery, Defendants have continued to violate these regulations.

254.    Therefore, by failing to conduct required monitoring and inspections at the Quench Settler, Defendants have violated 40 C.F.R. § 61.347(a) and (b) and 30 Tex. Admin. Code § 122.143(4).

255.    Each such violation of a rule or order of the TCEQ is also a violation of Tex. Health & Safety Code § 382.085(b).

256.    Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Defendants are liable to the United States for civil penalties for each such violation occurring during their

respective periods of ownership and operation of the Facility, and PMNA is liable for injunctive relief.

257.     For each such violation, pursuant to Sections 7.032, 7.101, 7.102 and 7.105 of the Texas Water Code, Tex. Water Code §§ 7.032, 7.101, 7.102 and 7.105, Defendants are also liable to the State for civil penalties for violations occurring during their respective periods of ownership and operation of the Facility, and PMNA is liable for injunctive relief.

## TWENTIETH CLAIM FOR RELIEF – CAA (BWON)
### (Failure to Comply with Drain System Requirements)

258.     Paragraphs 1 through 94 are realleged and incorporated herein by reference.

259.     40 C.F.R. § 61.342(c)(1)(i) – (ii) requires that the owner or operator of a facility at which the total annual benzene quantity from facility waste is equal to or greater than 10 Mg/yr (11 ton/yr) must remove or destroy the benzene contained in the waste using a treatment process or wastewater treatment system that complies with the standards in 40 C.F.R. § 61.348, and must comply with the standards specified in 40 C.F.R. §§ 61.343 – 61.347, for each waste management unit that receives or manages the waste stream prior to and during treatment of the waste stream.

260.      Pursuant to 40 C.F.R. § 61.342(c), owners or operators of facilities where the TAB is equal or greater than 10 Mg/yr must comply with the standards in 40 C.F.R. § 61.346 for each "individual drain system" in which waste is placed. "[I]ndividual drain system" is defined in the regulation as "the system used to convey waste from a process unit, product storage tank, or waste management unit to a waste management unit. The term includes all process drains and common junction boxes, together with their associated sewer lines and other junction boxes, down to the receiving waste management unit." 40 C.F.R. § 61.341.

51

261.    A "sewer line" is defined in the regulation as "a lateral, trunk line, branch line, or other enclosed conduit used to convey waste to a downstream waste management unit." 40 C.F.R. § 61.341.

262.    The regulations at 40 C.F.R. § 61.346 require that an owner or operator control individual drain systems either by using a closed vent system and control device for each individual drain system opening, 40 C.F.R. § 61.346(a)(1), or, as an alternative, by equipping each drain with water seal controls or a tightly sealed cap or plug, pursuant to 40 C.F.R. § 61.346(b)(1). Further, 40 C.F.R. § 61.346(b)(3) states that each sewer line shall not be open to the atmosphere and shall be covered or enclosed in such a manner as to have no visible gaps or cracks in joints, seals, or other emission interfaces.

263.    During the 2009 Inspection, EPA inspected DuPont's individual drain systems. EPA found that above surface process drains (pipes) conveying wastes from process equipment to below grade sewer drains were open to the atmosphere because they discharged into concrete lined areas before they reached the receiving sewer drains. During the 2015 Inspection, EPA determined that these same above surface process drains were still not connected to the receiving sewer drains; there remained a gap (from several inches to over a foot) between the discharge from the process drains and the riser of the receiving sewer drains that allowed the escape of fugitive benzene emissions to the atmosphere.

264.    Therefore, by failing to enclose all process drains or connect process drains to the receiving sewer drains, DuPont violated the control requirements of 40 C.F.R. § 61.346 and 30 Tex. Admin. Code § 122.143(4). Subject to reasonable opportunity for further investigation or discovery, Defendants have continued to violate these requirements from at least the date of the

2009 Inspection to the present.

265.    Each such violation of a rule or order of the TCEQ is also a violation of Tex. Health & Safety Code § 382.085(b).

266.    Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Defendants are liable to the United States for civil penalties for each such violation occurring during their respective periods of ownership and operation of the Facility, and PMNA is liable for injunctive relief.

267.    For each such violation, pursuant to Sections 7.032, 7.101, 7.102 and 7.105 of the Texas Water Code, Tex. Water Code §§ 7.032, 7.101, 7.102 and 7.105, Defendants are also liable to the State for civil penalties for violations occurring during their respective periods of ownership and operation of the Facility, and PMNA is liable for injunctive relief.

## TWENTY-FIRST CLAIM FOR RELIEF – CAA (BWON)
### (Failure to Comply with 2 Mg/Yr Limit)

268.    Paragraphs 1 through 94 are realleged and incorporated herein by reference.

269.    40 C.F.R. § 61.342(c)(1)(i) – (ii) requires that the owner or operator of a facility at which the total annual benzene quantity from facility waste is equal to or greater than 10 Mg/yr (11 ton/yr) must remove or destroy the benzene contained in the waste using a treatment process or wastewater treatment system that complies with the standards in 40 C.F.R. § 61.348, and must comply with the standards specified in 40 C.F.R. §§ 61.343 – 61.347, for each waste management unit that receives or manages the waste stream prior to and during treatment of the waste stream.

270.    40 C.F.R. § 61.342(c)(3) provides that a waste stream is exempt from the requirements of 40 C.F.R. § 61.343(c)(1) provided that the total annual benzene quantity in all

waste streams chosen for exemption in 40 C.F.R. § 61.343(c)(3)(ii) does not exceed 2.0 Mg/yr (2.2 ton/yr), as determined in the procedures in 40 C.F.R. § 61.355(j).

271.    EPA observed during its 2009 Inspection that above surface process drains conveying wastes from process equipment to below grade sewer drains were open to the atmosphere because they discharged into concrete lined areas before they reached the water seals for the receiving sewer drains. EPA observed during its 2015 Inspection that these same above surface process drains were still not connected to the receiving sewer drains; there remained a gap (from several inches to over a foot) between the discharges from the process drains and the risers of the receiving sewer drains that allowed the escape of fugitive benzene emissions to the atmosphere. DuPont incorrectly identified these waste streams as controlled in its 2009 TAB Report.

272.    In the 2008-2016 TAB Reports, DuPont incorrectly reported less than 2 Mg/yr of uncontrolled waste streams. Based on EPA's observations and the waste stream data, however, uncontrolled benzene emissions from the process drains are actually over 6 Mg/yr.

273.    Therefore, by generating over 2 Mg/yr of uncontrolled benzene waste streams each year during the period from at least 2008 through 2015, DuPont violated 40 C.F.R. § 61.342(c)(1) and 30 Tex. Admin. Code § 122.143(4).

274.    Subject to a reasonable opportunity for additional investigation and discovery, Defendants have continued to misreport uncontrolled benzene at the Facility and violate 40 C.F.R. § 61.342(c)(1) and 30 Tex. Admin. Code § 122.143(4).

275.    Each such violation of a rule or order of the TCEQ is also a violation of Tex. Health & Safety Code § 382.085(b).

276.    Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), DuPont is liable to the United States for civil penalties for each such violation occurring during their respective periods of ownership and operation of the Facility, and PMNA is liable for injunctive relief.

277.    For each such violation, pursuant to Sections 7.032, 7.101, 7.102 and 7.105 of the Texas Water Code, Tex. Water Code §§ 7.032, 7.101, 7.102 and 7.105, Defendants are also liable to the State for civil penalties for violations occurring during their respective periods of ownership and operation of the Facility, and PMNA is liable for injunctive relief.

### TWENTY-SECOND CLAIM FOR RELIEF – CAA (BWON)
(Failure to Maintain Records Identifying Waste Streams)

278.    Paragraphs 1 through 94 are realleged and incorporated herein by reference.

279.    Pursuant to 40 C.F.R. § 61.356(b), owners or operators of facilities where the TAB is equal or greater than 10 Mg/yr must maintain records that identify each waste stream at the facility subject to BWON requirements.

280.    During the 2009 Inspection, sewer lines to several drains were open to the atmosphere because they discharged into concrete lined areas before they reached the water seals for the drain. During the 2015 Inspection, EPA Inspectors discovered that many of the drains listed in the Facility's records were not identified at the same location as in the 2009 Inspection. DuPont could not explain the differences, nor identify current locations of drains identified in the TAB Reports.

281.    Therefore, by failing to maintain records identifying each waste stream at the Facility subject to BWON requirements, DuPont violated 40 C.F.R. § 61.356(b) and 30 Tex. Admin. Code §§ 116.115(c) and 122.143(4). Subject to reasonable opportunity for further investigation or discovery, Defendants have continued to violate these requirements from at least

the date of the 2015 Inspection to the present.

282.     Each such violation of a rule or order of the TCEQ is also a violation of Tex. Health & Safety Code § 382.085(b).

283.     Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Defendants are liable to the United States for civil penalties for each such violation occurring during their respective periods of ownership and operation of the Facility, and PMNA is liable for injunctive relief.

284.     For each such violation, pursuant to Sections 7.032, 7.101, 7.102 and 7.105 of the Texas Water Code, Tex. Water Code §§ 7.032, 7.101, 7.102 and 7.105, Defendants are also liable to the State for civil penalties for violations occurring during their respective periods of ownership and operation of the Facility, and PMNA is liable for injunctive relief.

<u>**TWENTY-THIRD CLAIM FOR RELIEF – CAA (BWON)**</u>
(Failure to Operate API Separator with No Detectable Emissions)

285.     Paragraphs 1 through 94 are realleged and incorporated herein by reference.

286.     Pursuant to 40 C.F.R. § 61.347(a)(1)(i)(A), the cover and all openings of an oil-water separator shall be designed to operate with no detectable emissions as measured by an instrument reading of less than 500 ppmv above background.

287.     Defendants have used an American Petroleum Institute oil-water separator (API Separator) to separate heavy aromatic distillate ("HAD") from wastewater generated in the ethylene process area. The HAD product is 50% benzene and is collected in tanks and loaded onto barges for sale. The wastewater from the API Separator is collected in tanks and sent to the Ethylene Steam Strippers.

288.     The API Separator is an "oil-water separator" as that term is defined in 40 C.F.R.

§ 61.341.

289.    During the 2015 Inspection, emissions measured from the cover of Defendants'

API Separator exceeded 35,000 ppmv due in part to leaks/holes in the API Separator. DuPont

failed to seal the leaks from the API Separator for several days. On January 25, 2016, EPA made

an unannounced visit to the Facility where EPA observed repairs that DuPont had made to the

API Separator and found no detectable emissions at that time.

290.    By failing to operate the API Separator without detectable emissions, DuPont

violated the requirements at 40 C.F.R. § 61.347(a)(1) and 30 Tex. Admin. Code 122.143(4).

Subject to reasonable opportunity for further investigation or discovery, DuPont violated these

requirements for at least the four days of the 2015 Inspection and likely for some period before

and after the Inspection.

291.    Each such violation of a rule or order of the TCEQ is also a violation of Tex.

Health & Safety Code § 382.085(b).

292.    Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), DuPont is liable to

the United States for civil penalties for each such violation.

293.    For each such violation, pursuant to Sections 7.032, 7.101, 7.102 and 7.105 of the

Texas Water Code, Tex. Water Code §§ 7.032, 7.101, 7.102 and 7.105, DuPont is also liable to

the State for civil penalties.

### TWENTY-FOURTH CLAIM FOR RELIEF – CAA (BWON)
(Failure to Comply with Monitoring Requirements at API Separator)

294.    Paragraphs 1 through 94 are realleged and incorporated herein by reference.

295.    40 C.F.R. § 61.347(a) and 30 Tex. Admin. Code 122.143(4) require that the

owner or operator of an oil-water separator must design, operate and maintain a fixed roof and

closed-vent system that routes all organic vapors to a control device and that each opening shall be maintained in a closed, sealed position at all times that waste is in the oil-water separator. 40 C.F.R. § 61.347(b) requires the owner or operator to inspect each cover seal and all openings by visual inspection quarterly to ensure that no cracks or gaps occur between the cover and the oil-water separator. 40 C.F.R. § 61.347(c) requires that a broken seal or gasket be repaired as soon as practicable but no less than 15 days after identification.

296.    During the 2015 Inspection, DuPont told inspectors that its most recent quarterly inspection of the API Separator had occurred on October 29, 2015, and that it had not observed gaps or cracks between the cover and separator wall.

297.    During the 2015 Inspection, EPA inspectors observed very aged and cracked caulking with an obvious gap between the cover and the oil-water separator wall and measured excessive benzene emissions there. A proper inspection of the API Separator in October 2015 would have detected the gap. On January 25, 2016, EPA made an unannounced visit to the Facility where EPA observed repairs that DuPont had made to the API Separator and found no detectable emissions at that time from the API Separator.

298.    Therefore, by failing to conduct the required inspections at the API Separator to ensure that no cracks or gaps occur between the cover and the oil-water separator wall, and that the access hatches and other openings were closed and gasketed properly, DuPont violated 40 C.F.R. § 61.347(a) and (b) and 30 Tex. Admin. Code 122.143(4). Subject to reasonable opportunity for further investigation or discovery, even with the particular leaks repaired, in the absence of a change to DuPont's standard operating procedures, Defendants have continued to violate the quarterly inspection requirements from at least the date of the 2015 Inspection to the

present.

299.     Each such violation of a rule or order of the TCEQ is also a violation of Tex. Health & Safety Code § 382.085(b).

300.     Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Defendants are liable to the United States civil penalties for each such violation occurring during their respective periods of ownership and operation of the Facility, and PMNA is liable for injunctive relief.

301.     For each such violation, pursuant to Sections 7.032, 7.101, 7.102 and 7.105 of the Texas Water Code, Tex. Water Code §§ 7.032, 7.101, 7.102 and 7.105, Defendants are also liable to the State for civil penalties for violations occurring during their respective periods of ownership and operation of the Facility, and PMNA is liable for injunctive relief.

### TWENTY-FIFTH CLAIM FOR RELIEF – CAA (BWON)
(Failure to Properly Design and Operate API Separator Vent System)

302.     Paragraphs 1 through 94 are realleged and incorporated herein by reference.

303.     Pursuant to 40 C.F.R. § 61.349(a)(1), vent systems coming from an oil-water separator shall be designed such that any bypass lines that could divert a subject vent stream away from a control device used to comply with BWON requirements must include a flow indicator that provides a record of vent stream flow away from the control device at least once every 15 minutes.

304.     Defendants' API Separator is vented to a waste heat steam superheater for destruction of benzene vapors.

305.     During the 2015 Inspection, EPA observed a bypass line to the superheater that did not have a flow indicator on the line. Inspectors also observed that a conservation vent on the bypass line was dripping condensate and venting emissions directly to the atmosphere on three

successive days. On January 25, 2016, EPA made an unannounced visit to the Facility where EPA observed the bypass line with infrared cameras and found no detectable emissions from the vent at that time, but there was still no flow meter as required.

306.     By failing to install, maintain, and operate a flow indicator on the bypass line, DuPont violated the requirements at 40 C.F.R. § 61.349(a)(1)(ii) and 30 Tex. Admin. Code 122.143(4). Subject to reasonable opportunity for further investigation or discovery, Defendants have continued to violate the flow monitor requirement from at least the date of the 2015 Inspection to the present.

307.     Each such violation of a rule or order of the TCEQ is also a violation of Tex. Health & Safety Code § 382.085(b).

308.     Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Defendants are liable to the United States for civil penalties for each such violation occurring during their respective periods of ownership and operation of the Facility, and PMNA is liable for injunctive relief.

309.     For each such violation, pursuant to Sections 7.032, 7.101, 7.102 and 7.105 of the Texas Water Code, Tex. Water Code §§ 7.032, 7.101, 7.102 and 7.105, Defendants are also liable to the State for civil penalties for violations occurring during their respective periods of ownership and operation of the Facility, and PMNA is liable for injunctive relief.

### TWENTY-SIXTH CLAIM FOR RELIEF – CAA (BWON)
(Failure to Comply with 2 Mg/Yr Limit at the API Separator)

310.     Paragraphs 1 through 94 are realleged and incorporated herein by reference.

311.     The regulations at 40 C.F.R. § 61.342(c)(1)(i) – (ii) require that the owner or operator of a facility at which the total annual benzene quantity from facility waste is equal to or

greater than 10 Mg/yr (11 ton/yr) must remove or destroy the benzene contained in the waste using a treatment process or wastewater treatment system that complies with the standards in 40 C.F.R. § 61.348, and must comply with the standards specified in 40 C.F.R. §§ 61.343 – 61.347 for each waste management unit that receives or manages the waste stream prior to and during treatment of the waste stream. 40 C.F.R. § 61.342(c)(3) provides that a waste stream is exempt from the requirements of 40 C.F.R. § 61.343(c)(1) provided that the total annual benzene quantity in all waste streams chosen for exemption in 40 C.F.R. § 61.343(c)(3)(ii) does not exceed 2.0 Mg/yr (2.2 tons/yr), as determined using the procedures in 40 C.F.R. § 61.355(j).

312.    DuPont operated the API Separator in poor working condition and inconsistent with the requirements in 40 C.F.R. §§ 61.343 – 61.347 to operate the oil-water separator with no detectable emissions. At the time of the 2015 inspection, the control device for the API Separator was bypassed, so benzene vapors were venting directly to the atmosphere.

313.    During the four-day period of the 2015 Inspection, DuPont managed a flow of approximately 39 Mg of uncontrolled benzene waste through the API Separator which emitted vapors directly to the atmosphere. On January 25, 2016, EPA made an unannounced visit to the Facility where EPA observed repairs that DuPont had made to the API Separator and found no detectable emissions at that time from the API Separator.

314.    Therefore, by generating over 2 Mg of uncontrolled benzene waste streams in 2015, Defendant violated 40 C.F.R. § 61.342(c)(1) and 30 Tex. Admin. Code § 122.143(4). Subject to reasonable opportunity for further investigation or discovery, Defendant violated these requirements for at least the four days of the 2015 Inspection and likely for some period before and after the 2015 Inspection.

315.     Each such violation of a rule or order of the TCEQ is also a violation of Tex.

Health & Safety Code § 382.085(b).

316.     Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), DuPont is liable to

the United States for civil penalties for each such violation.

317.     For each such violation, pursuant to Sections 7.032, 7.101, 7.102 and 7.105 of the

Texas Water Code, Tex. Water Code §§ 7.032, 7.101, 7.102 and 7.105, DuPont is also liable to

the State for civil penalties.

### TWENTY-SEVENTH CLAIM FOR RELIEF – CAA (BWON)
(Failure to Operate DGF Unit with No Detectable Emissions)

318.     Paragraphs 1 through 94 are realleged and incorporated herein by reference.

319.     Pursuant to 40 C.F.R. §§ 61.348(a)(2) and 61.347(a)(1), any waste stream

treatment process shall be designed and operated with no detectable benzene emissions as

measured by an instrument reading of less than 500 ppmv above background.

320.     Defendants use a dissolved gas flotation unit ("DGF Unit") as part of its ethylene

process wastewater treatment.

321.     The DGF Unit is a treatment process as defined by 40 C.F.R. § 61.341.

322.     During the 2015 Inspection, EPA measured multiple components of DuPont's

DGF Unit, including a hatch and vacuum breaker/pressure relief device, to be leaking at a rate of

over 10,000 ppmv. During a subsequent Facility visit by EPA Inspectors on January 24, 2016,

EPA again detected benzene emissions in excess of 500 ppmv at a majority of the hatches on the

top of the DGF unit.

323.     By failing to design and operate the DGF Unit without detectable benzene

emissions, DuPont violated the requirements at 40 C.F.R. §§ 61.348(a)(2) and 61.347(a)(1) and

30 Tex. Admin. Code 122.143(4). Subject to reasonable opportunity for further investigation or discovery, Defendants have continued to violate these requirements from at least the date of the 2015 Inspection to the present.

324.     Each such violation of a rule or order of the TCEQ is also a violation of Tex. Health & Safety Code § 382.085(b).

325.     Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Defendants are liable to the United States for civil penalties for each such violation occurring during their respective periods of ownership and operation of the Facility, and PMNA is liable for injunctive relief.

326.     For each such violation, pursuant to Sections 7.032, 7.101, 7.102 and 7.105 of the Texas Water Code, Tex. Water Code §§ 7.032, 7.101, 7.102 and 7.105, Defendants are also liable to the State for civil penalties for violations occurring during their respective periods of ownership and operation of the Facility, and PMNA is liable for injunctive relief.

### TWENTY-EIGHTH CLAIM FOR RELIEF – CAA (BWON)
(Failure to Certify Compliance – Steam Stripper)

327.     Paragraphs 1 through 94 are realleged and incorporated herein by reference.

328.     Pursuant to 40 C.F.R. § 61.356(e)(1), owners or operators using a treatment process or wastewater treatment system unit subject to 40 C.F.R. § 61.348 must maintain a signed and dated statement certifying that the unit is designed to operate at the documented performance level when the waste stream entering the unit is at the highest waste stream flow rate and benzene content expected to occur. This certification must be retained for the life of the unit.

329.     DuPont operated two ethylene plant steam strippers at its Facility: the North

Steam Stripper (DA-1100), and the South Steam Stripper (DA-1101).

330.    The ethylene plant steam strippers are treatment processes subject to 40 C.F.R. § 61.348.

331.    DuPont violated 40 C.F.R. § 61.356(e)(1) by failing to maintain a signed certification for each stripper that the steam strippers are designed to operate at the documented performance level when the waste stream entering the unit is at the highest waste stream flow rate and benzene concentration expected to occur. DuPont could not produce the certification to inspectors during the 2009 Inspection.

332.    Each such violation is also a violation of 30 Tex. Admin. Code § 122.143(4).

333.    Each such violation of a rule or order of the TCEQ is also a violation of Tex. Health & Safety Code § 382.085(b).

334.    Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Defendant is liable to the United States for civil penalties for each such violation.

335.    For each such violation, pursuant to Sections 7.032, 7.101, 7.102 and 7.105 of the Texas Water Code, Tex. Water Code §§ 7.032, 7.101, 7.102 and 7.105, DuPont is also liable to the State for civil penalties.

## TWENTY-NINTH CLAIM FOR RELIEF- CAA (MON)
### (Failure to Comply with MON Drain Requirements at C Unit)

336.    Paragraphs 1 through 94 are realleged and incorporated herein by reference.

337.    The C Unit is a "miscellaneous organic chemical manufacturing process" unit ("MCPU"), as defined by 40 C.F.R. § 63.2550, and thus is subject to the Miscellaneous Organic Chemical Manufacturing NESHAP ("MON"), 40 C.F.R. Part 63, Subpart FFFF.

338.    The Melt Cutter Water Sump (Emission Point PL-10/12) is part of the C Unit.

339.    DuPont's NOCS for the MON dated October 7, 2008 ("2008 NOCS") lists the wastewater from the Melt Cutter Water Sump as a Group 1 wastewater.

340.    40 C.F.R. § 63.2485(a) provides that the owner or operator that has wastewater streams within a MCPU [e.g., the C Unit] must meet the requirements in 40 C.F.R. Part 63, Subpart FFFF, Table 7.

341.    40 C.F.R. Part 63, Subpart FFFF, Table 7 provides that the owner or operator must comply with the requirements of 40 C.F.R. §§ 63.132 – 63.148, except as specified in 40 C.F.R. § 63.2485.

342.    Pursuant to 40 C.F.R. § 63.132(a)(2), wastewater streams that have been designated as Group 1 for Table 8 and 9 compounds must comply with applicable requirements for individual drain systems as specified in 40 C.F.R. § 63.136.

343.    In its 2008 NOCS, DuPont designated wastewater from DuPont's C Unit Melt Cutter Water Sump as a Group 1 wastewater stream.

344.    40 C.F.R. § 63.136 provides that if an individual drain system receives or manages a Group 1 wastewater stream, or a residual removed from a Group 1 wastewater stream, the drain system must be controlled as specified therein.  More specifically, 40 C.F.R. § 63.136(e)(3) provides that each sewer line shall not be open to the atmosphere and shall be covered or enclosed in such a manner so as to have no visible gaps or cracks in the joints, seals, or other emission interfaces.

345.    "[I]ndividual drain system" is defined in the regulation as "the system used to convey wastewater streams or residuals to a waste management unit or to discharge or disposal. The term includes hard-piping, all process drains and junction boxes, together with their

associated sewer lines and other junction boxes, manholes, sumps, and lift stations, conveying wastewater streams or residuals. . . ." 40 C.F.R. § 63.111.

346.    A "sewer line" is defined in the regulation as "a lateral, trunk line, branch line, or other conduit, including, but not limited to, grates, trenches, etc., used to convey wastewater streams or residuals to a downstream waste management unit." 40 C.F.R. § 63.111.

347.    At its 2009 Inspection, EPA observed that the Melt Cutter Water Sump overflow water is discharged into an open sewer line that is not controlled.

348.    By discharging a Group 1 wastewater into an open sewer line that is not controlled, DuPont violated 40 C.F.R. §§ 63.132(a)(2) and 63.136(e)(3) and 30 Tex. Admin. Code §§ 113.120 and 122.143(4). Subject to reasonable opportunity for further investigation or discovery, Defendants have continued to violate these requirements for a Group 1 wastewater from at least the date of the 2009 Inspection to the present.

349.    Each such violation of a rule or order of the TCEQ is also a violation of Tex. Health & Safety Code § 382.085(b).

350.    Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Defendants are liable to the United States for civil penalties for each such violation occurring during their respective periods of ownership and operation of the Facility, and PMNA is liable for injunctive relief.

351.    For each such violation, pursuant to Sections 7.032, 7.101, 7.102 and 7.105 of the Texas Water Code, Tex. Water Code §§ 7.032, 7.101, 7.102 and 7.105, Defendants are also liable to the State for civil penalties for violations occurring during their respective periods of ownership and operation of the Facility, and PMNA is liable for injunctive relief.

66

**THIRTIETH CLAIM FOR RELIEF- CAA (MON)**
(Failure to Comply with MON Surface Impoundment
Requirements at Fifth Street Wood-Lined Ditch)

352.    Paragraphs 1 through 94 are realleged and incorporated herein by reference.

353.    Pursuant to 40 C.F.R. § 63.132(a)(2), wastewater streams that have been designated as Group 1 for Table 8 and 9 compounds must comply with applicable requirements for surface impoundments as specified in 40 C.F.R. § 63.134.

354.    40 C.F.R. § 63.134(a) provides, *inter alia*, that any surface impoundment that receives, manages, or treats a Group 1 wastewater stream or a residual removed from a Group 1 wastewater stream, must be covered and meet the control requirements of 40 C.F.R. § 63.134(b).

355.    "Surface impoundment" is defined in 40 C.F.R. § 63.111 as meaning "a waste management unit that is a natural topographic depression, manmade excavation, or diked area formed primarily of earthen materials, which is designed to hold an accumulation of liquid wastes or waste containing free liquids."

356.    The Fifth Street Wood-Lined Ditch is a "surface impoundment" as that term is defined by 40 C.F.R. § 63.111.

357.    The Fifth Street Wood-Lined Ditch is uncovered.

358.    The C Unit Melt Cutter Water Sump overflow water is discharged to the Fifth Street Wood-Lined Ditch.

359.    By discharging a Group 1 wastewater into an uncovered surface impoundment DuPont violated 40 C.F.R. §§ 63.132(a)(2) and 63.134(b) and 30 Tex. Admin. Code §§ 113.120 and 122.143(4). Starting June 13, 2017, this is also a violation of 30 Tex. Admin. Code § 116.115(c). Subject to reasonable opportunity for further investigation or discovery,

Defendants have continued to violate these requirements for a Group 1 wastewater from at least the date of the 2009 Inspection to the present.

360.    Each such violation of a rule or order of the TCEQ is also a violation of Tex. Health & Safety Code § 382.085(b).

361.    Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Defendants are liable to the United States for civil penalties during their respective periods of ownership and operation of the Facility, and PMNA is liable for injunctive relief.

362.    For each such violation, pursuant to Sections 7.032, 7.101, 7.102 and 7.105 of the Texas Water Code, Tex. Water Code §§ 7.032, 7.101, 7.102 and 7.105, Defendants are also liable to the State for civil penalties for violations occurring during their respective periods of ownership and operation of the Facility, and PMNA is liable for injunctive relief.

## THIRTY-FIRST CLAIM FOR RELIEF- CAA
(Failure to Include All Required Information for a Group 2
Wastewater Stream in NOCS)

363.    Paragraphs 1 through 94 are realleged and incorporated herein by reference.

364.    40 C.F.R. §§ 63.146(b)(1)(iii) & (iv) provides that for Group 2 wastewater streams, the owner or operator shall include in its NOCS the concentration of Table 8 and 9 compound(s) in parts per million, by weight, and the flow rate in liters per minute.

365.    DuPont's 2008 NOCS identifies "Wastewater Sumps –EPN PL-4H" in the C Unit as Group 2 wastewater streams, but it does not provide the concentration of Table 8 and 9 compound(s) in parts per million, by weight, and the flow rate in liter per minute for the Wastewater Sumps. Also, it is unclear which sumps DuPont is referring to in its NOCS.

366.    DuPont violated 40 C.F.R. §§ 63.146(b)(1)(iii) & (iv) and 30 Tex. Admin. Code

§§ 113.120 and 122.143(4) by failing to include all required information in the 2008 NOCS. Starting June 13, 2017, this is also a violation of 30 Tex. Admin. Code § 116.115(c). Subject to reasonable opportunity for further investigation or discovery, Defendants have failed to revise the NOCS for the Facility and have continued to violate these requirements for the NOCS from at least the date of the 2009 Inspection to the present.

367.    Each such violation of a rule or order of the TCEQ is also a violation of Tex. Health & Safety Code § 382.085(b).

368.    Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Defendants are liable to the United States for civil penalties for each such violation occurring during their respective periods of ownership and operation of the Facility, and PMNA is liable for injunctive relief.

369.    For each such violation, pursuant to Sections 7.032, 7.101, 7.102 and 7.105 of the Texas Water Code, Tex. Water Code §§ 7.032, 7.101, 7.102 and 7.105, Defendants are also liable to the State for civil penalties for violations occurring during their respective periods of ownership and operation of the Facility, and PMNA is liable for injunctive relief.

### THIRTY-SECOND CLAIM FOR RELIEF- CAA
(Failure to Comply with MON Control Requirements at the C Unit)

370.    Paragraphs 1 through 94 are realleged and incorporated herein by reference.

371.    Pursuant to 40 C.F.R. § 63.132(a)(2), wastewater streams that have been designated as Group 1 streams must, among other things, meet the applicable control requirements for Table 9 compounds set forth in 40 C.F.R. § 63.138.

372.    Pursuant to 40 C.F.R. § 63.138(a) and (b), existing sources of Group 1 wastewater streams must control Table 9 compounds through one of seven control options set forth in

40 C.F.R. § 63.138(b), (d)-(i). These measures require treatment of Group 1 wastewater streams to reduce the concentration of Table 9 compounds.

373.    The Melt Cutter Water Sump overflow water is not controlled or treated for Group 1 wastewater streams.

374.    Therefore, DuPont violated 40 C.F.R. § 63.138(a) by failing to control or treat the Melt Cutter Water Sump overflow water, a Group 1 wastewater stream, for Table 9 compounds. Subject to reasonable opportunity for further investigation or discovery, Defendants have continued to violate these requirements for a Group 1 wastewater from at least the date of the 2009 Inspection to the present.

375.    Each such violation is also a violation of 30 Tex. Admin. Code §§ 113.120 and 122.143(4). Starting June 13, 2017, this is also a violation of 30 Tex. Admin. Code § 116.115(c).

376.    Each such violation of a rule or order of the TCEQ is also a violation of Tex. Health & Safety Code § 382.085(b).

377.    Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Defendants are liable to the United States for civil penalties for each such violation occurring during their respective periods of ownership and operation of the Facility, and PMNA is liable for injunctive relief.

378.    For each such violation, pursuant to Sections 7.032, 7.101, 7.102 and 7.105 of the Texas Water Code, Tex. Water Code §§ 7.032, 7.101, 7.102 and 7.105, Defendants are also liable to the State for civil penalties for violations occurring during their respective periods of ownership and operation of the Facility, and PMNA is liable for injunctive relief.

## THIRTY-THIRD CLAIM FOR RELIEF- CAA (MON)
### (Failure to Determine Waste Stream Group Status at C, D, and G Units)

379.     Paragraphs 1 through 94 are realleged and incorporated herein by reference.

380.     Pursuant to 40 C.F.R. § 63.144(a), an owner or operator subject to the MON must determine which process wastewater streams require control for Table 8 and/or Table 9 compounds, and shall either determine Group 1 or Group 2 status of the wastewater stream using the procedures forth in § 63.144(b) and (c), or designate the stream as a Group 1 wastewater stream. 40 C.F.R. § 63.144(a)(1) and (2).

381.     "Process wastewater" is defined in 40 C.F.R. § 63.101 as "wastewater which, during manufacturing or processing, comes into direct contact with or results from the production or use of any raw material, intermediate product, finished product, by-product, or waste product."

382.     During its 2009 Inspection, EPA observed certain process wastewater streams from the C, D, and G Units that were not identified in DuPont's NOCS. DuPont failed to determine whether these process wastewater streams require control for Table 8 and/or Table 9 compounds, and failed to determine the Group 1 or Group 2 status of the process wastewater streams. These waste streams include, but are not limited to, classifiers #1 and #2 wash waters, purge blender rinsate and decanter water.

383.     Therefore, DuPont violated 40 C.F.R. § 63.144(a) by failing to determine whether certain process wastewater streams require control for Table 8 and/or Table 9 compounds, and by failing to determine the Group 1 or Group 2 status of certain process wastewater streams, or to designate the streams as Group 1 streams. Subject to reasonable opportunity for further investigation or discovery, Defendants have continued to violate these requirements from at least

the date of the 2009 Inspection to the present.

384.     Each such violation is also a violation of 30 Tex. Admin. Code §§ 113.120,

122.143(4) and 116.115(c).

385.     Each such violation of a rule or order of the TCEQ is also a violation of Tex.

Health & Safety Code § 382.085(b).

386.     Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Defendants are

liable to the United States for civil penalties for each such violation occurring during their

respective periods of ownership and operation of the Facility, and PMNA is liable for injunctive

relief.

387.     For each such violation, pursuant to Sections 7.032, 7.101, 7.102 and 7.105 of the

Texas Water Code, Tex. Water Code §§ 7.032, 7.101, 7.102 and 7.105, Defendants are also

liable to the State for civil penalties for violations occurring during their respective periods of

ownership and operation of the Facility, and PMNA is liable for injunctive relief.

## THIRTY-FOURTH CLAIM FOR RELIEF
(Attorney's Fees For State of Texas)

388.     Paragraphs 1 through 94 are realleged and incorporated herein by reference.

389.     This is an enforcement action brought by the State of Texas under the authority of

Subchapter D, Chapter 7, of the Texas Water Code; Tex. Water Code ch. 7, subch. D.

390.     Accordingly, the State is entitled to recover reasonable attorneys' fees, court

costs, and reasonable investigative costs incurred in relation to this proceeding, pursuant to Tex.

Water Code § 7.108.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, the United States of America and the State of Texas, respectfully pray that this Court provide the following relief:

1.     An order directing PMNA to take all steps necessary to comply with the statutory and regulatory requirements cited in this Complaint;

2.     An order directing PMNA to take appropriate measures to mitigate the effects of its violations;

3.     An order assessing civil penalties against Defendants in favor of the United States;

4.     An order assessing civil penalties and attorneys' fees against Defendants in favor of the State of Texas;

5.     A judgment awarding the United States and the State of Texas the costs of this action; and

6.      Such further relief as this Court may deem appropriate.

Respectfully submitted,

**FOR THE UNITED STATES OF AMERICA**

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

Dated: _10/05/2021_

KENNETH G. LONG
D.C. Bar No. 414791
Senior Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, D.C.  20044-7611
202-514-2840
Kenneth.long@usdoj.gov

NICHOLAS J. GANJEI
Acting United States Attorney
Eastern District of Texas

/s/ James Gillingham
JAMES GILLINGHAM
Assistant U.S. Attorney
Eastern District of Texas
110 N. College Street; Suite 700
Tyler, Texas 75702
E-mail: James.Gillingham@usdoj.gov
(903) 590-1400
(903) 590-1436 (fax)
Texas State Bar # 24065295

ATTORNEYS FOR THE UNITED STATES

**FOR THE STATE OF TEXAS:**

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

SHAWN COWLES
Deputy Attorney General for Civil Litigation

PRISCILLA M. HUBENAK
Chief, Environmental Protection Division

*J. H. Edwards*

THOMAS H. EDWARDS
Assistant Attorney General
Tex. Bar No. 06461800
Thomas.Edwards@oag.texas.gov


Office of the Attorney General
Environmental Protection Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel: (512) 463-2012
Fax: (512) 320-0911

ATTORNEYS FOR THE STATE OF TEXAS